UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 07-61388-CIV COOKE/BANDSTRA

SOUTHERN GROUTS & MORTARS, INC.,
a Florida corporation,

        Plaintiff,

   vs.

3M COMPANY, a foreign corporation, a/k/a
MINNESOTA MINING AND
MANUFACTURING COMPANY,

        Defendant.

_____

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

### I. INTRODUCTION

Plaintiff Southern Grouts & Mortars, Inc. ("SGM") commenced this action against 3M Company ("3M") on September 28, 2007, alleging that 3M has been engaged in unlawful conduct regarding the domain name "diamondbrite.com" since at least as early as 2000, when 3M allegedly acquired that domain name in bad faith. The nine months that have passed since SGM filed its original Complaint have been punctuated by many motions, shifting theories of liability, eleventh-hour but prodigious written discovery propounded by SGM, and troublingly tardy responses by SGM to 3M's discovery efforts (when SGM has responded at all). Now, however, the untimeliness of SGM's suit, and the pronounced lack of merit in its underlying claims, are laid bare by the record. 3M is entitled to summary judgment on all of SGM's claims.

## II. ARGUMENT

A.   The Summary Judgment Standard

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In order for an issue of material fact to be genuine, the court must be satisfied that evidence exists upon which the finder of fact could reasonably find for the party opposing the motion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-52, 106 S. Ct. 2505, 25 10-12, 91 L. Ed. 2d 202 (1986).

The plain language of Fed. R. Civ. P. 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322, 106 S. Ct. at 2552. The initial burden is on the moving party to show "that there is an absence of evidence to support the nonmoving party's case." *Id.,* 477 U.S. at 325, 106 S. Ct. at 2554. The moving party may meet this burden by identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "designate specific facts showing that there is a genuine issue for trial." *Id.,* 477 U.S. at 324, 106 S. Ct. at 2553 *(quoting* Fed. R. Civ. P. 56(e)). "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial. It need only point to an absence of proof on the plaintiff's part." *Parker v. Sony Pictures Entertainment, Inc.*, 260 F.3d 100, 111 (2d Cir. 2001). Significantly, the party resisting summary judgment "may not rest upon the mere allegations or denials of his pleading."

*Liberty Lobby,* 477 U.S. at 248, 106 S. Ct. at 2510 (internal quotation marks omitted).   All reasonable inferences from the evidence must be viewed in the light most favorable to the non-moving party, but the court need not accept the non-movant's inferences if they are "implausible."  *Mize*, 93 F.3d at 743 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 592-94 (1986)).

3M respectfully submits that there is no genuine issue of material fact to support plaintiff SGM's allegations herein and that 3M is entitled to summary judgment on all counts of the Second Amended Complaint as a matter of law.

B.      SGM's Claims

In SGM's third attempt to state claims against 3M, its Second Amended Complaint includes a variety of counts, all centered on the same factual premise.  Specifically, SGM contends that eight years ago, in 2000, 3M acquired the assets of American Electronic Sign Company ("AESC"), in particular that company's domain name diamondbrite.com, "to prevent SGM's use of the domain name" (Second Amended Complaint, ¶30)[1]; that "3M intentionally registered and continues to traffic in the domain name to divert Internet traffic" from SGM (*id.*, ¶42); that 3M has "forward[ed]" visitors to www.diamondbrite.com to "other 3M owned domains to the benefit of 3M" (*id.*, ¶29); and that 3M "could" have used or "can" use the domain name diamondbrite.com to "gain valuable information about consumer's interest in Plaintiff's products" by analyzing "hits" to that domain name (*id.*, ¶43).  SGM further implies that 3M "warehouses" domain names (*id.*, ¶37.)  In response to 3M's motion to dismiss the Second Amended Complaint, this Court ruled that most of SGM's allegations were sufficient to

---

[1] SGM owns the domain name diamondbrite.cc.  (SMF, ¶1.)  Incredibly, SGM once owned the domain names diamondbrite.net and diamondbrite.org, but allowed those registrations to lapse in 2002.  (*Id.*)

withstand a motion to dismiss, based largely on SGM's allegation of "the forwarding/redirecting and accumulation and utilization of website data." (April 29, 2008 Order Granting in Part, and Denying in Part, Defendant's Motion to Dismiss the Second Amended Complaint at 4, 6, 8, 16.)

C.    SGM's Claims Are Barred by Laches

The record is clear that SGM has been well-attuned to the status of the domain name diamondbrite.com for many years. In July 2001 – notably, only eight months after 3M had acquired the domain name – SGM, itself defending cybersquatting claims at the time, advised this very Court that

> SGM was prevented from registering it's [sic] flagship product under the domain name DIAMOND BRITE due to prior registration by another entity . . . . The old adage "The early bird gets the worm" (or in this case, the domain name) may be cited in support of SGM's rationale.

(Declaration of Laura J. Hein, Ex. 1 at ¶3.) A year later, in July of 2002, SGM sent its "3rd request" addressed to 3M's Domain Name Administrator, in which SGM noted that "the domain [diamondbrite.com] is not in use" and asked if 3M would "please let us take the domain name?" (3M's Statement of Material Facts ("SMF"), ¶19.) SGM's self-styled "3[rd] request" e-mail was discovered by 3M as a result of its searches of thousands of historical records as part of its attempt to reconstruct long-ago events relating to the domain name diamondbrite.com, but 3M has been unable to locate any other e-mail messages to or from SGM on the subject, and SGM has produced no documents or witnesses of its own, and so 3M is unable to determine the content or timing of any previous requests from SGM or any responses that 3M might have made to any of them. Thus, the record is silent as to any further communications to or from SGM, until SGM attorney Andrew Peretz wrote to 3M two and a half years later, on February 18, 2005.

Mr. Peretz, in his February 2005 letter, stated that it had "come to [their] attention" that 3M was "using" the domain, but he did not identify how circumstances had changed, if at all, from July of 2002, when SGM had observed that the domain was "not in use." In any event, Mr. Peretz now accused 3M of "cyberpiracy" and demanded that 3M transfer the domain name to SGM. 3M declined to comply with SGM's demand, and invited Mr. Peretz's questions and any evidence he might have supporting SGM's claims, concluding that "[o]therwise, we will consider the matter closed." Neither Mr. Peretz nor any other representative of SGM responded with questions, evidence, or anything else, for more than two more years. Then, on July 2, 2007, a different attorney representing SGM, Frank Herrera, wrote to 3M, acknowledging the 2005 exchange of letters between the parties but offering no explanation for the passage of time in the interim. In this letter, Mr. Herrera did not contend that 3M was "using" the domain (indeed, he observed that "it appears that the site has been entirely inactive for more than six (6) years"); nor did Mr. Herrera contend that 3M was a "cyberpirate" or that it had ever done anything unlawful. After 3M again expressed its unwillingness to part with the domain name, SGM filed this action, about a month later.

Quite apart from the serious questions that the above events raise about SGM's good faith in bringing this lawsuit at all, they offer conclusive evidence that SGM, by July of 2002 but almost certainly earlier, was fully aware that 3M owned the domain and was *not using it*.[2] There is nothing in the record indicating that any facts or circumstances arose after July 2002 that prompted the allegations of illicit "use" and other alleged misconduct by 3M that form the basis of SGM's claims in this case, nor has SGM ever contended that 3M fraudulently concealed from SGM any of those alleged facts.

---

[2] As demonstrated elsewhere in the record and discussed below, 3M deactivated that domain some time between April and July of 2002, and the domain has been inactive ever since.

Over the more than five years that passed between SGM's admitted awareness of 3M's nonuse of the domain name and the filing of this action, 3M employees or contractors with personal knowledge of, for example, 3M's integration of AESC's website content into the pages of 3M.com/tcm, or the configuration of 3M's DNS servers in the first years after the acquisition, have left the company, have moved to other divisions, and/or have faded memories of the details that SGM now insists are relevant.  Equally if not more important, documents, e-mails and other electronic data created five, six or seven years ago are more difficult to search for, review and locate, if they continue to exist at all:  to cite but one example, in August 2006, 3M transferred its external domain name services to a third party vendor, and no longer operates its own external DNS servers.

These and other consequences of the passage of years, described in further detail in the SMF and accompanying Declarations, would prejudice 3M's efforts to defend almost any claim involving distant events and detailed records of its daily electronic activities.  In this case, however, the prejudice to 3M is magnified at least twofold.  First, SGM's claims effectively require 3M to defend them by demonstrating that it did *not* engage in the conduct SGM alleges on *any single day* since it acquired diamondbrite.com nearly eight years ago.  Second, though SGM was quite late to undertake discovery in this case, SGM is apparently dedicated to the notion that 3M is hiding something, and its discovery requests have been aggressive, voluminous and far-reaching, requiring 3M to undertake extensive efforts to determine not only what responsive information it can locate, but what potentially responsive information it *cannot* locate.

While the Lanham Act does not contain a statute of limitations, the 11th Circuit applies the limitations period for analogous state law claims as the "touchstone" for laches defenses. *Kason v. Component Hardware Group, Inc.*, 120 F.3d 1199, 1203 (11th Cir. 1997).  Thus, this

Court must apply Florida's four-year statute of limitations period as the touchstone for the laches defense. (*Id.*)

A claim filed beyond the "touchstone" statute of limitations gives rise to a rebuttable presumption of laches. *See Santana Products, Inc. v. Bobrick Washroom Equipment, Inc.*, 401 F.3d 123, 138-39 (3d Cir. 2005) (in Lanham Act case, "[o]nce the statute of limitations has expired, the defendant 'enjoys the benefit of a presumption of inexcusable delay and prejudice.'") (citations omitted); *Jarrows Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 837 (9th Cir. 2002) ("Therefore, consistent with the views of our sister circuits, we hold that if a [Lanham Act] claim . . . is filed after the analogous limitations period has expired, the presumption is that laches is a bar to suit.") (collecting cases of other circuits, including *Kason*).

Here, there is no dispute that more than four years passed between early 2002, when SGM learned that 3M owned, and was not using, diamondbrite.com, and the commencement of this action (September 2007). Thus, the claim was filed beyond the statute of limitations period and a presumption of laches applies. Courts have not hesitated to dismiss Lanham Act claims on laches grounds when the plaintiff inexplicably delayed bringing suit for even a few years. *See, e.g., E-Systems, Inc. v. Monitek, Inc.*, 720 F.2d 604 (9th Cir. 1983) (six-year delay); *American Dietaids Co. v. Plus Products*, 412 F. Supp. 691 (S.D.N.Y. 1976), *aff'd*, 551 F.2d 299 (2d Cir. 1976) (seven-year delay); *Columbia University v. Columbia/HCA Healthcare Corp.*, 964 F. Supp. 733 (S.D.N.Y. 1997) (3½ year delay).

While it is true that 3M has not invested sums promoting or advertising its inactive domain name, the required prejudice necessary to establish a laches defense need not be expenditure of money or use of the domain name. Rather, prejudice for laches purposes can consist of "prejudice at trial due to loss of evidence or faded memory of witnesses."

*Bridgestone/Firestone Research, Inc. v. Automobile Club De L'Ouest De La France*, 245 F.3d 1359, 1362 (Fed. Cir. 2001). *See also Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 412 (6th Cir. 2002), *cert. denied*, 538 U.S. 907 (2003) ("Unavailability of important witnesses, dulling of memories of witnesses and loss or destruction of relevant evidence all constitute prejudice."); *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1033 (Fed. Cir. 1992) ("Evidentiary, or "defense" prejudice, may arise by reason of a defendant's inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts"). The Court in *Nartron* also noted that "because of the time that has elapsed, the cost of defending Nartron's claim has increased geometrically due, in part, to the amount of material [defendant] has been required to produce in its defense."

In order to defend SGM's claims here, 3M must investigate alleged events spanning nearly eight years and undertake to identify and locate witnesses, documents and electronically stored information, all in an attempt to demonstrate that it *never engaged* in the conduct alleged. In essence, 3M must engage in a massive effort to cull through thousands of records and test dozens of faded memories to confirm that certain alleged events *never happened*. Such a task, difficult under the best of circumstances, is made nearly impossible by the passage of so many years, during which 3M employees with potentially relevant knowledge have left the company or have transferred to other divisions, documents and files have been relocated or discarded in the ordinary course of business, and 3M's computer systems have been upgraded, reconfigured, and/or moved. As such, 3M is severely prejudiced in its ability to reconstruct events, track down witnesses, and search for documents and electronically stored information in order to demonstrate that the alleged conduct did not happen.

Each of the Declarations offered by 3M employees in support of this motion reflects, to one degree or another, the faded memories and the increased burdens of the investigations prompted by SGM's delay in asserting its claims. (*See*, in particular, Declaration of Jennifer A. Mitchell at ¶¶3-4.)  Although "a presumption of laches may be eliminated by offering evidence to show an excuse for the delay or that the delay was reasonable," *Ramos v. Biomet, Inc.*, 828 F. Supp. 1570, 1583 (S. D. Fla. 1993), SGM has not offered, and cannot offer, any plausible, let alone legally sufficient, excuse for its delay.  *See, e.g., E.T. Mfg. Co. v. Xomed, Inc.*, 679 F. Supp. 1082, 1085 (M. D. Fla. 1987) (plaintiff's proposed excuse of "continuous negotiations to reach settlement" rejected, where facts reflected that more than two years of silence had passed between the parties' settlement communications; plaintiff's patent infringement claims barred by laches due to evidentiary prejudice to defendant).

"The application of the defense of laches is committed to the sound discretion of the trial court." *Ramos*, 828 F. Supp. at 1583.  3M is entitled to summary judgment on its laches defense as a matter of equity.

D.     SGM's Unfair Competition Claims (Count I)

Although this Court concluded that SGM's pleadings "on information and belief" regarding 3M's allegedly unlawful "use" of the domain name diamondbrite.com were sufficient to survive a motion to dismiss, their utter lack of factual support now renders them ripe for summary judgment.  As reflected in 3M's SMF filed herewith, along with the accompanying declarations of various 3M personnel, 3M maintained diamondbrite.com as an active domain for approximately 18 months after the AESC acquisition, while 3M integrated AESC's dynamic sign technology business into 3M's Traffic Control Materials Division (now its Traffic Safety Systems Division, or "TSSD") and while 3M undertook a redesign of that division's own

website at www.3M.com/tcm.   Shortly after the acquisition and 3M's deactivation of the
diamondbrite.com domain name in between April and July in 2002, 3M placed a graphic on the
www.diamondbrite.com website alerting visitors to "3M Dynamic Message Systems, Formerly
American Electronic Sign," and providing a link to www.3M.com/tcm.   Since 3M deactivated
the domain diamondbrite.com in 2002, there is no evidence that 3M has *ever used* that domain to
"redirect" or "divert" would-be visitors, has *ever used* that domain to gather or analyze traffic,
"hits" or attempted "hits" to that website, or that it has *ever used* that domain in any other
manner to compete with SGM or to otherwise attempt to gain some advantage over SGM.
SGM's theory – that 3M's acquisition and alleged use of the domain name diamondbrite.com
have been part of a scheme to violate SGM's purported rights – is, in light of the uncontroverted
facts, nothing more than a product of SGM's imagination.

E.     SGM's Trademark Dilution Claims (Counts II and III)

SGM's dilution claims under 15 U.S.C. §1125(c) rely on the same factually empty
allegations of domain name "use" that are fatal, as a matter of law, to its unfair competition
claims discussed above.   SGM's trademark dilution theory, however, is accompanied by the
additional allegations that its DIAMOND BRITE mark is "famous," that the lack of content at
what by all rights should be *its* website at www.diamondbrite.com tarnishes its image, and that
3M has acted unlawfully as a "spoiler" by owning the domain diamondbrite.com.   (Second
Amended Complaint, ¶57.)

As detailed in 3M's February 7 Motion to Dismiss, a mark must be "truly prominent and
renowned," "must rise to the level of 'Buick' or 'Kodak,'" *Carnival Corp. v. SeaEscape Casino
Cruises, Inc.*, 74 F. Supp. 2d 1261, 1270 (S. D. Fla. 1999), *quoting Avery Dennison Corp. v.
Sumpton*, 189 F.2d 868, 875 (9th Cir. 1999), and must be "widely recognized by the general

-10-

consuming public of the United States as a designation of source of the goods or services of the mark's owner" in order to qualify for protection under §1125(c). *Michael Caruso & Co., Inc. v. Estefan Enterprises, Inc.*, 994 F. Supp. 1454, 1463 (S. D. Fla. 1998). The record in this case, however, is barren of any evidence tending to show that SGM's DIAMOND BRITE mark even approaches that exalted status under the "fame" factors enumerated in §1125(c)(2)(A), the most critical of which is "the extent of actual recognition of the mark." §1125(c)(2)(A)(iii). *See, e.g., Avery Dennison Corp. v. Sumpton,* 189 F.3d 868, 878-79 (9th Cir. 1999) (reversing with instructions to enter summary judgment for defendant where plaintiff's evidence of extensive advertising and sales, international operations, and longstanding use was unaccompanied by any evidence of "whether consumers in general have any brand association" with plaintiff's marks).

Moreover, SGM's FTDA claims require proof that its DIAMOND BRITE mark *was* famous before 3M's allegedly unlawful "use" of the domain diamondbrite.com began. *See* 15 U.S.C. §1125(c)(1). Indeed, at least one court has held that for purposes of the FTDA, the date on which the fame of the plaintiff's mark should be measured is the date on which there began "*any* commercial use" of that mark, by anyone else, for any such use is "arguably diluting" of the plaintiff's mark. *Nissan Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002, 1013 (9th Cir. 2004) (emphasis added). Neither SGM's Second Amended Complaint nor its answers to 3M's first set of interrogatories specifically identifies a date, or even the year, that its mark became "famous," but whatever that date allegedly might have been, SGM's failure of proof is the same.

F.   Florida Anti-Dilution Statute (Count IV)

Per this Court's April 29 Order, SGM's claims under Florida's Anti-Dilution Statute, Fla. Stat. §495.151, have been dismissed with respect to acts occurring before January 1, 2007. (Order at 13.) The record contains no evidence that 3M was "using" the domain

diamondbrite.com in any manner, let alone in a manner remotely associated with its allegedly competitive COLORQUARTZ product, after 3M deactivated the domain in 2002; indeed, all evidence is decidedly to the contrary.

The statute expressly premises liability on "use by another" of a famous mark; and, as this Court has already observed, even SGM's unconventional "use" theories are all tied to 3M's alleged "use" in a manner related to, connected with, and [in] furtherance of" 3M's COLORQUARTZ product. (Order at 13, n. 14.) Because there are simply no facts supporting any such use after January 1, 2007 (or indeed ever), 3M is entitled to summary judgment on Count IV.

G.      Anti-Cybersquatting Consumer Protection Act ("ACPA") (Count V)

In order for SGM to prevail in its ACPA claim, it must demonstrate that 3M "(i) has a bad faith intent to profit from [SGM's] mark . . . ***and*** (ii) registers, traffics in, or uses a domain name that . . . is distinctive . . . [or] . . . famous at the time of registration of the domain name, [and] is identical to or confusingly similar to or dilutive of that mark . . . ." 15 U.S.C. §1125(d)(1)(A) (emphasis added). Because SGM cannot designate any facts showing a genuine issue for trial of either 3M's "bad faith intent to profit" from 3M's registration, trafficking in, or use of a mark that was "distinctive" or "famous" at the time of the registration, SGM is entitled to summary judgment on SGM's purported claims under the ACPA.

1.      No "Bad Faith Intent to Profit"

The ACPA calls for consideration of nine factors when determining whether or not a defendant has a "bad faith intent to profit" from another's mark. Those factors are:

> **(I)** the trademark or other intellectual property rights of the person, if any, in the domain name;
> **(II)** the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

**(III)** the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

**(IV)** the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

**(V)** the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

**(VI)** the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

**(VII)** the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

**(VIII)** the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

**(IX)** the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c).

15 U.S.C. §1125(d)(1)(B)(i). The ACPA also provides a safe harbor for defendants who "had reasonable grounds to believe that the use of the domain name was fair use or otherwise lawful." 15 U.S.C. §1125(d)(2)(B)(ii).

Here, an analysis of the relevant factors in view of the record leaves no doubt that 3M's acts have at all times been conducted in *good* faith with respect to the mark DIAMOND BRITE and the corresponding domain name. SGM has not produced, and cannot produce, a whit of evidence that 3M's acquisition of diamondbrite.com in 2000 was anything other than a tiny part of an entirely legitimate business transaction, and that 3M's brief period of use thereafter was in connection with the bona fide offering of 3M's newly acquired dynamic sign technology (Factors I and III). SGM has not produced, and cannot produce, a whit of evidence of 3M's

alleged "intent to divert customers" from SGM's website to 3M's COLORQUARTZ site (Factor V): in fact, the evidence is conclusive to the contrary, for the record reflects that the 3M division that sells its COLORQUARTZ products was not even *aware* of 3M's ownership of diamondbrite.com until 2005, three years after the domain was deactivated. Furthermore, all use of the diamondbrite.com website before it was deactivated was indisputably in furtherance of the legitimate purposes of the 3M Traffic Control Materials Division that acquired it, *i.e.,* to transition customers and would-be customers who were looking for the former American Electronic Sign Company to the new owner of that business. 3M has never offered to transfer, sell, or otherwise assign the domain name to any person (Factor VI). There is no evidence, and SGM does not even allege, that 3M has ever made any false representations in connection with its registration of the domain name (Factor VII).

Having failed to produce any facts suggesting that 3M has ever acted with a "bad faith intent to profit" under the other §1125(d)(1)(B)(i) factors, SGM presumably hopes to seize on Factor VIII – "[defendant's] registration or acquisition of multiple domain names which [defendant] knows are identical to or confusingly similar to the marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration . . . ." – in its quest to unearth some hint of a pattern of malevolent conduct on 3M's part. SGM may point to 3M's hefty portfolio of domain names, but 3M is itself the owner of nearly 18,000 pending or issued *trademark* registrations around the world, which trademarks it uses in connection with its sale of nearly *50,000 different products around the world*; it is hardly surprising, let alone suggestive of improper motives, that 3M should be the registered owner of thousands of domain names. Undaunted, SGM desperately digs further to contend that a tiny fraction of those domain names (among them "goodskin.org"

and "hiland.biz") contain marks that 3M "knows" are identical or confusingly similar to the marks of others that were distinctive or famous at the time 3M registered them.  This claim is, on its face, a stretch of logic and reason, and it is unsupported in any respect by the record.  Even *if* SGM could show that any of these domain names contained the "distinctive" or "famous" marks of others, and even *if* SGM could show that 3M *knew when it registered any one* of those domain names that they included the "distinctive" or "famous" marks of others, none of which has any support in the record, such a showing would fall woefully short of evidence of the "paradigmatic harm" that the ACPA was designed to address, *i.e.,* "the practice of cybersquatters registering several hundred domain names in an effort to sell them to the legitimate owners of the mark." *Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806, 810 (6th Cir. 2004).  *See also, e.g.,* H.R. Rep. No. 106-412, at 13 (showing that Congress, in enacting the ACPA, warned that the ACPA "does not suggest that mere registrations of multiple domain names is an indication of bad faith."); *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 239 (4th Cir. 2002) (noting that many companies legitimately register many domain names "consisting of various permutations of their own trademarks in combination with other words").  Significantly, SGM does not and cannot point to more than *one* domain name, among the many thousands that 3M owns, that incorporates the term DIAMOND BRITE or any misspellings or variations of that term.  (If 3M were a "cybersquatter" intent on profiting in bad faith from SGM's trademarks, 3M would presumably have jumped at the chance to register "diamondbrite.net" and "diamondbrite.org" after SGM allowed those registrations to expire in 2002.)  The lack of any other such domain names in 3M's portfolio only lends further support to 3M's demonstration of

good faith in this case and the complete lack of evidence of any "bad faith intent to profit" from the DIAMOND BRITE mark.[3]

In short, SGM seeks to pin its entire "bad faith to profit" theory solely on its wholly unsupported claim that a tiny fraction of a single percentage of 3M's registered domain names were registered in bad faith rendering 3M a serial cybersquatter and a "warehouser" whose bad faith in registering diamondbrite.com may be inferred despite all of the incontrovertible evidence to the contrary.  There is, to 3M's knowledge, not a shadow of legal authority to support the notion that the claims here can amount to a conclusion of "warehousing," let alone legal authority for the notion that such claims can nullify all other uncontroverted facts demonstrating 3M's *good* faith intent with respect to the domain name at issue, diamondbrite.com.  If the ACPA could be construed to so operate, then *any* of a company's domain names would be up for grabs by anyone who could claim that one or two of that company's *other* domain names might have been registered in "bad faith," without regard to any of the other seven factors enumerated in §1125(d)(1)(B)(i).  At least one court has noted that the notion of "warehousing," while relevant to a bad faith determination under the ACPA, is not as important to the analysis as the defendant's "prior conduct" in offering to sell domain names for financial gain, per §1125(d)(1)(B)(i)(VI). *See Compana, LLC v. Aetna, Inc.*, 2006 WL 1319456 at *4.

Here, there is no evidence that 3M has ever attempted to sell the domain name diamondbrite.com to anyone (the evidence is to the contrary, *see* SMF at ¶26).  As for 3M's

---

[3] SGM, in alleging that 3M has acted as a "spoiler" in preventing SGM's use of the domain name diamondbrite.com, cites to a use of that term by the Ninth Circuit in *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316 (9th Cir. 1998), a case that predated the enactment of the ACPA and addressed what was at that time the "novel issue" of a defendant's methodical registration of dozens of domain names containing the famous mark of others in order to extract fees from those trademark owners.  The term has no application, factually or legally, to SGM's ACPA claims or to this case.

"prior conduct," SGM has not shown, and cannot show, that 3M has ever before in its history been the target of a "cybersquatting" case (the evidence is to the contrary, *see* SMF at ¶25).  Far from a typical cybersquatting case against a "cyberpirate," the facts here come nowhere close to presenting an act of cybersquatting within the meaning of the ACPA.

The last factor enumerated in §1125(d)(1)(B)(i), "the extent to which the mark incorporated in [defendant's] domain name registration is or is not distinctive and famous" merits independent attention, for that language also characterizes the second part of the two-part test for liability under the ACPA, namely, SGM must prove that 3M "registers, traffics in, or uses" a domain name that is either "distinctive" or "famous" at the time of registration of the domain name.  §1125(d)(1)(A)(i)(ii).

2.      The DIAMOND BRITE Mark is Neither Distinctive Nor Famous

The "distinctiveness" or "strength" of a mark refers to the degree to which the mark is recognized and associated by the public mind with goods or services emanating from a particular source. *E.g., McCarthy on Trademarks*, §11:75.

SGM's "incontestable" federal trademark registration of DIAMOND BRITE does not transform that mark into a famous one, or even a distinctive one.  *E.G., Oreck Corp. v. U.S. Floor Systems, Inc.*, 803 F.2d 166, 171 (5th Cir. 1986) ("Incontestable status does not make a weak mark strong."); *HBP, Inc. v. American Marine Holdings, Inc.,* 290 F. Supp. 2d 1320, 1329 (M. D. Fla. 2003) ("incontestable status—somewhat of a misnomer—does not mean that a mark's strength cannot be attacked.").   *See generally McCarthy*, §32:155 (collecting cases). Moreover, a registered trademark, "incontestable" or not, does not imbue its owner with unlimited exclusive rights; rather, it serves as prima facie evidence of the registrant's "exclusive right to use the registered mark in commerce on or in connection with the goods or services

specified in the certificate." 15 U.S.C. §1057(b). Trademark distinctiveness is, instead, measured by both its inherent strength, *i.e.*, whether the mark is generic, descriptive, suggestive, arbitrary or fanciful, and its commercial strength, *i.e.* the recognition value of the mark in the marketplace. *E.g., John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966 (11th Cir. 1983). Where numerous sellers use similar marks, a mark cannot be very "distinctive," and it is given a relatively narrow scope of protection. *See, e.g., Frehling Enterprises, Inc. v. Int'l Select Group, Inc.,* 192 F.3d 1330, 1336 (11th Cir. 1999); *Sun Banks of Fla., Inc. v. Sun Fed. Savings & Loan Ass'n,* 651 F.2d 632, 632 (5th Cir. 1981). The "crowded field" phenomenon is especially notable where laudatory or other terms are in common use as marks. *See McCarthy*, §11:86 (noting such examples as the diluted terms ROYAL, GOLD MEDAL, BLUE RIBBON, JEWEL and STAR).

Here, the mark DIAMOND BRITE, far from serving as a unique identifier of SGM's goods, is, or during the relevant time frame has been, in use by at least a dozen other, unrelated entities for a broad array of goods and services. Under the circumstances, DIAMOND BRITE is a weak mark, hardly a distinctive one. *E.g., Sun Banks*, 651 F.2d at 316 (extensive third party uses of SUN "both within and without the financial community" rendered plaintiff's mark weak; permanent injunction reversed).

    3.    No "Registration, Trafficking in, or Use" of a Distinctive or Famous Mark

In order to prevail on its ACPA claims, SGM must demonstrate that DIAMOND BRITE is either "distinctive" or "famous." As demonstrated above, the record reflects no facts remotely sufficient to show that its mark is (or was) famous or distinctive for purposes of any of its claims, so 3M is entitled to summary judgment on the ACPA claims without further ado.

Even *if* SGM's mark DIAMOND BRITE had been "distinctive" or "famous" when 3M acquired the domain name in 2000, there is simply no evidence that anyone at 3M's TSSD had even *heard* of that mark, or of SGM itself, until years after the acquisition; at the same time, personnel in 3M's Industrial Mineral Products Division, who *were* familiar with SGM and its DIAMOND BRITE mark, were not aware that TSSD had acquired the DIAMOND BRITE mark or domain name, again until years later.  Even if DIAMOND BRITE has *become* "distinctive" or "famous" at any time since 3M acquired the domain name – of which there is similarly no evidence – and even if 3M's re-registration and maintenance of that inactive domain name could constitute "registration, trafficking in, or use" of that domain name, the record here can allow no conclusion but that 3M has acted in good faith at *all* relevant times, and is not liable under the ACPA as a matter of law.

      4.    Reasonable Grounds to Believe that the Use of the Domain Name was Fair or Otherwise Lawful

The ACPA explicitly directs that the "bad faith intent" required to violate that statute "shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was fair or otherwise lawful." §1125(d)(2)(B)(ii).  The "reasonable belief" defense to an ACPA claim rests on the good faith intention and motivation that existed at the time the challenged domain name *was obtained.  See Shields v. Zuccarini*, 89 F. Supp. 2d 634 (E.D. Pa. 2000), *aff'd*, 254 F.3d 476 (3d Cir. 2001); *Sporty's Farm v. Sportsman's Market, Inc.*, 202 F.3d 489 (2d Cir. 2000); *see generally* 4 *McCarthy on Trademarks* §25:78.

Here, of course, SGM can point to not a single fact that casts any reasonable doubt on 3M's wholly legitimate acquisition of the trademark DIAMOND BRITE and the domain name diamondbrite.com.   Indeed, the record establishes without qualification that 3M's post-

acquisition use of the trademark and domain to transition the AESC business, and its decision not to abandon the domain name to potential infringers of its valuable DIAMOND GRADE mark, point only to reasonable business practices and to 3M's reasonable belief that its ownership and use of diamondbrite.com were, and are, lawful in every respect.

In sum, SGM's strenuous allegations of 3M's bad faith in this case, all made on "information and belief," are revealed by the record to be empty, disturbingly empty, of substance.  SGM, no matter how intense its desire to paint 3M with the brush of "bad faith," cannot support its claims with facts, and it is not, unfortunately, alone in that regard.  As one administrative panel of the WIPO Arbitration and Mediation Center once observed, in the context of a domain name dispute:

> Allegations of bad faith are serious allegations.  They should not be made lightly . . . .  The Panel is well aware that there is a tendency for some trademark owners to hold extravagant views as to their legitimate rights and to hold excessive views as to the motives of those whom they believe to be infringers, but that is no excuse for making wild allegations of bad faith.

*Smart Design LLC v. Carolyn Hughes*, WIPO Case No. D2000-0993.

### III. CONCLUSION

Although not legally required to "prove a negative" for purposes of this motion or for any other purpose in this lawsuit, 3M has been effectively forced to do just that, to the extent that it can do so after so many years have passed since SGM knew everything it needed to know to posit its empty theories of trademark "use" and "bad faith."  SGM's theories in this case, apparently manufactured out of whole cloth in hopes of pressuring 3M to surrender a domain lawfully acquired and legitimately maintained, cannot pass muster here.  Summary judgment on all of SGM's claims is warranted.

Dated:  June 26, 2008.

Of Counsel:
Laura J. Hein, Esquire
laura.hein@gpmlaw.com
Dean C. Eyler, Esquire
dean.eyler@gpmlaw.com
Gray Plant Mooty
500 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55401
Telephone: (612) 632-3097

Respectfully submitted,

RICHMAN GREER, P.A.
*Attorney for Defendant 3M Company*
Miami Center – Suite 1000
201 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 373-4000
Facsimile: (305) 373-4099

By:___/s/Mark A. Romance_____
        Mark A. Romance (Fla. Bar No. 021520)
        mromance@richmangreer.com

## CERTIFICATE OF SERVICE

I HEREBY certify that on June 26, 2008, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By:___Mark A. Romance_____
        MARK A. ROMANCE

## SERVICE LIST
### CASE NO.  07-61388-CIV COOKE/ BANDSTRA

Scott W. Rothstein, Esquire
srothstein@rra-law.com
Frank Herrera, Esq
fherrera@rra-law.com
Gustavo Sardina, Esq
gsardina@rra-law.com
Rothstein Rosenfeldt Adler
401 East Las Olas Boulevard
Suite 1650
Ft. Lauderdale, Florida  33301
Telephone: (954) 522-3456
Facsimile: (954) 527-8663
*Attorneys for Plaintiff*

Mark A. Romance, Esquire
Richman Greer, P.A.
Miami Center – Suite 1000
Miami, Florida 33131
Telephone: (305) 373-4000
Facsimile: (305) 373-4099
mromance@richmangreer.com
*Attorneys for Defendant 3M Company*

Laura J. Hein, Esquire
laura.hein@gpmlaw.com
Dean C. Eyler, Esquire
dean.eyler@gpmlaw
*Attorney for Defendant 3M Company*
Gray Plant Mooty
500 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55401
Telephone: (612) 632-3097
Facsimile: (612) 632-4097
*Attorneys for Defendant 3M Company*