## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

SOUTHERN GROUTS & MORTARS, INC.,
a Florida corporation,

      Plaintiff,

v.                             Case No.: 07-61388-CIV-COOKE/BANDSTRA

3M COMPANY,
a foreign corporation,

_____Defendant_____ /

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

      Plaintiff Southern Grouts & Mortars, Inc. ("SGM"), by and through its undersigned counsel, pursuant to Rule 56(c), Fed.R.Civ.P. and Rule 7.5. S.D. Fla. L.R., files its Motion for Summary Judgment, and in support states as follows:

## SUMMARY OF ARGUMENT

      While at first, the facts of this case may seem complicated, in fact, the case is quite simple. 3M's actions regarding the diamondbrite.com domain name are in direct violation of the Anti-Cybersquatting Consumer Protection Act ("ACPA") and the Lanham Act. 3M violated the ACPA because (a) SGM's **DIAMOND BRITE** mark is famous and distinctive and, as such, entitled to protection; (b) 3M's diamondbrite.com domain name is identical and/or confusingly similar to SGM's **DIAMOND BRITE** mark; and (c) 3M has used the domain name with a bad faith intent to profit. See Bavaro Palace, S.A. v. Vacation Tours, Inc., 203 Fed. Appx. 252, 256 (11th Cir. 2006). 3M engaged in unfair competition in violation of the Lanham Act because it (1) used SGM's **DIAMOND BRITE** mark in commerce without SGM's consent, and (2) 3M's unauthorized use is likely to cause confusion, to cause mistake, or to deceive. See Optimum Technologies, Inc. v. Henkel Consumer Adhesives, Inc., 496 F.3d 1231, 1241 (11th Cir. 2007) (citing Burger King Corp. v. Mason, 710 F.2d 1480, 1491 (11th Cir. 1983)). Based upon the limited discovery obtained thus far, it is clear that summary judgment is appropriate under the facts of this case.

    I.      **INTRODUCTION - The Background of the Dispute and the Business of SGM**

      Since 1978, SGM has been a worldwide manufacturer and distributor of swimming pool spa and deck finishes and installation systems for ceramic tile. One of SGM's foremost products is its **DIAMOND BRITE** finishes, blends of selected quartz aggregates and fortified cement for new and re-finished swimming pools. SGM started using the mark **DIAMOND BRITE** at least as early as October 31, 1991 in connection with its swimming pool finishes. See Exhibit A to Statement of Material Facts In

1

Support of Plaintiff's Motion for Summary Judgment ("SMF"). Subsequently, SGM filed an application in the United States Patent and Trademark Office ("USPTO") on May 18, 1992, for a federal registration for the trademark "**DIAMOND BRITE**," which was granted on March 16, 1993, and is currently valid and subsisting. Id. SGM's exclusive right to use this registration became incontestable under 15 U.S.C. §§ 1065 and 1115 on July 2, 1999. See Exhibit B to SMF; see also Buying for the Home, LLC v. Humble Abode, LLC, 459 F. Supp. 2d 310 (D.C. NJ 2006)(Court may take judicial notice of federal trademark registrations on motion for summary judgment)(citing Island Software & Computer Serv., Inc. v. Microsoft Corp., 413 F.3d 257, 261 (2d Cir. 2005)). On May 17, 2003, the USPTO renewed SGM's federal trademark registration for the mark **DIAMOND BRITE**. Id.

Since at least as early as 1991, SGM has spent significant sums on advertising, promotional trade shows, and the like. See Exhibit Q to SMF. SGM's "DIAMOND BRITE" product is widely recognized in the relevant industry as a market leader. Several years ago an independent third party conducted a survey the results of which indicated that SGM and 3M were neck and neck in brand recognition for their respective competing products. See Exhibit O to SMF.

SGM has vigorously enforced its trademark rights in its **DIAMOND BRITE** products. To that end, SGM includes a trademark license agreement on the back of each sales invoice. See Exhibit P to SMF. Additionally, to further protect its incontestable trademark rights, in the early stages of the Internet, SGM sought to register the domain name www.diamondbrite.com, but found that is was unavailable. Relatively unsophisticated in the nature of law of the Internet, SGM spent its limited resources in adopting other domain names such as www.sgm.cc, and others.

Over the course of time, SGM learned that Defendant 3M Company (hereinafter referred to as "3M") acquired the diamondbrite.com domain name through an asset purchase agreement. See Exhibit C to SMF, Response No. 2. At some time prior to or shortly after the acquisition of AESC, 3M's Traffic Control Materials Division (now called the Traffic Safety Systems Division) decided that the business would not continue to use the marks acquired from AESC for the relevant products, nor would the AESC Marks be used in connection with any 3M products. Id. Therefore, 3M expressly abandoned any and all rights to the AESC Marks since at least as early as 2001. Id. Since 3M expressly abandoned any and all trademark rights that it could have conceivably had in the terms **DIAMOND BRITE** nearly six (6) years ago, it is clear from this litigation that 3M simply wanted to control the diamondbrite.com domain name and prevent SGM, its main competitor, from utilizing the **DIAMOND BRITE** trademark to establish a presence on the Internet. 3M's decision to do this and its subsequent activities such as re-registering the domain name several times as well as engaging in an unauthorized Google Adwords campaign which used SGM's "DIAMOND BRITE" trademark  constitutes a direct violation of the

2

Lanham Act and the ACPA.

## II.   ARGUMENT

Over the past decade, Courts have been challenged by the concept of applying traditional legal concepts to the Internet world in which we now live. Although a review of the relevant case law developed over the past several years illustrates the challenges faced by the courts, it is clear that the published decisions that provide real guidance are those that apply traditional analysis of trademark and unfair competition law. SGM believes that this Court will see through 3M's attempt to muddy the waters and otherwise distract from its actions, and find in favor of SGM.

Web pages are used to provide information about products in a much more detailed fashion than can be done through a standard advertisement. Sporty's Farm LLC v. Sportsman's Market, Inc., 202 F.3d 489, 493 (2nd Cir. 2000). Consumers and businesses order goods and services directly from company web pages. Id. A specific web site is most easily located by using its domain name. Brookfield Communications, Inc. v. West Coast Entertainment Corp., 174 F.3d 1036, 1044 (9th Cir. 1999)(citing Panavision Int'l, L.P. v. Toeppen, 141 F.3d 1316, 1327 (9th Cir. 1998)). Consumers often assume that the domain name of a particular company will be the company name followed by ".com." Panavision Int'l, L.P. v. Toeppen, 141 F.3d at 1327; Playboy Enters. v. Universal Tel-a-Talk, Inc., 1998 LEXIS 17282, at *2 (E.D. Pa. 1998); Cardservice Int'l, Inc. v. McGee, 950 F. Supp. 737, 741 (E.D. Va. 1997). Sometimes a trademark is better known than the company itself, in which case a web surfer may assume that the domain address will be "'trademark'.com." See Id.; Beverly v. Network Solutions, Inc., 1998 LEXIS 8888, at *1 (N.D. Cal. 1998) ("Companies attempt to make the search for their web site as easy as possible. They do so by using a corporate name, trademark or service mark as their web site address."). While SGM is very well known, its number one product **DIAMOND BRITE** is far more widely recognized by the general public. Thus, web surfers would logically presume that SGM's domain name for this product would be www.diamondbrite.com.

The consumer who assumes that "X'.com" corresponds to the web site of company X or trademark X will, however, sometimes be misled, as in the instant matter. For example, a consumer looking for the famous **DIAMOND BRITE** product will naturally assume that the domain name www.diamondbrite.com will be synonymous with products sold under SGM's **DIAMOND BRITE** trademark. Upon entering the domain name www.diamondbrite.com a consumer will receive a message stating that the browser could not locate the server at www.diamondbrite.com. See Exhibit K to SMF. This has and will continue to lead that potential consumer to seek an alternative product or otherwise lose interest in the search for the SGM's **DIAMOND BRITE** product. At the very least, it interferes with commerce on the Internet. 3M recognizes the commercial value of owning domain names that

contain a company's primary trademarks. 3M has emphasized the importance of a company's domain names by stating that "disclosure [of 3M's domain names] . . . would give a commercial advantage to 3M's business competitors and potentially cause significant economic harm to 3M."  (D.E. 82, pg. 2).

**A.**      **SUMMARY JUDGMENT STANDARD**

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed R. Civ. P. 56(c). The moving party bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). SGM has met this burden.

The nonmoving party may not rest upon mere allegations or denials in the pleadings, but must present affirmative evidence, setting forth specific facts to show the existence of a genuine issue for trial. See Celotex Corp., 477 U.S. at 322-23; Anderson, 477 U.S. at 257; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86, (1986); Victoria's Cyber Secret Limited Partnership v. Secret Catalogue, Inc. et al., 161 F. Supp. 2d 1339, 1345 (S.D. Fla. 2001). Only reasonable inferences can be drawn from the evidence in favor of the nonmoving party. Eastman Kodak Co. v. Image Tech. Servs., 504 U.S. 451, 469 n.14 (1992)(emphasis in original)(quoting H.L. Hayden Co. of New York, Inc. v. Siemens Med. Sys., Inc., 879 F.2d 1005, 1012 (2d Cir. 1989)).

The nonmovant's burden is not satisfied by "some metaphysical doubt as to material facts." Matsushita, 475 U.S. at 586; Legg v. Wyth, 428 F.3d 1317, 1323 (11th Cir. 2005). Conclusory allegations, unsubstantiated assertions, speculation, the mere existence of some alleged factual dispute, or "only a scintilla of evidence" is insufficient to meet the nonmovant's burden. See Lujan v. National Wildlife Federation, 497 U.S. 871, 888 (1990); Victoria's Cyber Secret Limited Partnership, 161 F. Supp. 2d at 1345. Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to its case on which it bears the burden of proof at trial. See Celotex Corp., 477 U.S. at 322; Optimum Technologies, Inc., 496 F.3d at 1239 (quoting Johnson v. Bd. of Regents, 263 F.3d 1234, 1243 (11th Cir. 2001)). "[S]ummary judgment may readily be granted in cases involving violations of the Lanham Act." Victoria's Cyber Secret Limited Partnership, 161 F. Supp. 2d at 1345 (and cases cited therein).

In ACPA and unfair competition claims, summary judgment has been granted by many district courts against cybersquatters and in favor of trademark owners. Omega S.A. v. Omega Eng'G, 228 F.

Supp. 2d 112, 119 (D. Conn. 2002); see also Virtual Works, Inc. v. Volkswagen of Am., Inc., 238 F.3d 264 (4th Cir. 2001); People for the Ethical Treatment of Animals v. Doughney, 263 F.3d 359 (4th Cir. 2001); Domain Name Clearing Co. v. F.C.F. Inc., 16 Fed. Appx. 108 (4th Cir. 2001); Eurotech, Inc. v. Cosmos European Travels Aktiengesellschaft, 213 F. Supp. 2d 612 (E.D. Va. 2002); Victoria's Cyber Secret Ltd. P'ship, 161 F. Supp. 2d at 1339; and Mattel, Inc. v. Adventure Apparel, 2001 U.S. Dist. LEXIS 13885 (S.D.N.Y. 2001). Summary judgment is warranted under the circumstances of this case.

### i.      **Summary Judgment is appropriate in this case as 3M has no trademark rights in the diamondbrite.com domain name**

SGM owns a federal trademark registration for the mark **DIAMOND BRITE**. See Exhibit A. However, its competitor, 3M, being fully aware that SGM owned a valid and subsisting federal trademark registration for the mark **DIAMOND BRITE**, acquired and systematically renewed and/or trafficked in the diamondbrite.com domain name. See Exhibit C to SMF at Response No. 2. Some time prior to or shortly after the acquisition of AESC, 3M's Traffic Control Materials Division decided to abandon the AESC Marks. Id. On or about on December 8, 2002 the USPTO cancelled the mark "DIAMOND BRITE" (and Design), Federal Registration No. 1,942,026, since 3M failed to file a Declaration of Continued Use thereby abandoning its rights thereto.[1] 3M expressly confirmed such abandonment in its responses to SGM's second set of interrogatories No. 2.

### B.      **Violation of the Anti-Cybersquatting Consumer Protection Act – Count V**

The ACPA is intended "to protect consumers and American businesses, to promote the growth of online commerce, and to provide clarity in the law for trademark owners by prohibiting the bad-faith and abusive registration of distinctive marks as Internet domain names with the intent to profit from the goodwill associated with such marks--commonly referred to as 'cybersquatting." E. &. J Gallo Winery v. Spider Webs, Ltd., 129 F.Supp. 2d 1033, 1043 (S.D. Tex. 2001)(citing Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc., 202 F.3d 489, 495 (2nd Cir. 2000)(quoting S. REP. No. 106-140, at 4 (1999)). The ACPA provides, in relevant part:

> A person shall be liable in a civil action by the owner of a mark . . . if, without regard to the goods or services of the parties, that person "has a bad faith intent to profit from that mark . . . which is protected as a mark under this section; and registers, traffics in, or uses a domain name that . . . is identical or confusingly similar to that mark;

15 U.S.C. § 1125(d)(1)(A).

---

[1] According to 15 U.S.C. § 1127,
      a mark shall be deemed to be "abandoned" if either of the following occurs:
          (1) When its use has been discontinued with intent not to resume such use, intent to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.

3M's position is that it is not liable under the ACPA because it did not use the diamondbrite.com domain name. SGM vigorously contends that 3M used the domain name. Regardless, SGM does not have to prove "use" in the trademark sense for 3M to be liable under the ACPA. To establish an ACPA violation the plaintiff must show "(a) its mark is distinctive or famous and entitled to protection; (b) the defendant's domain name is identical or confusingly similar to the plaintiff's mark; and (c) the defendant has registered, [trafficked in], or used the domain name with a bad faith intent to profit." Bavaro Palace, S.A. v. Vacation Tours, Inc., 203 Fed. Appx. 252, 256 (11th Cir. 2006). "[T]he elements of an ACPA claim permit a plaintiff to pursue three separate tracks of liability: (1) Distinctiveness, Identical or Confusingly Similar, and Bad Faith; (2) Famous, Identical or Confusingly Similar, and Bad Faith; and (3) Famous, Dilutive, and Bad Faith." Omega S.A., 228 F. Supp 2d at 121. SGM's mark is not only famous but distinctive. 3M's domain name is not only confusingly similar but identical to SGM's mark, and 3M has trafficked in and used the domain name with a bad intent to profit.

### i) SGM's DIAMOND BRITE trademark is distinctive and famous.

A mark is famous if it is widely recognized by the general consuming public as a designation of source of the goods or services of the mark's owner. 15 U.S.C. § 1125(c)(2)(A). In determining whether a mark possesses the requisite degree of recognition, the court may consider all relevant factors. 15 U.S.C § 1125(c)(2)(A)(i) – (iv).[2]

### a. The Duration, Extent, and Geographic Reach of "DIAMOND BRITE"

The existence of a federal registration confers presumptive trademark rights throughout the United States. See 15 U.S.C. §1057(c). SGM first used its trademark **DIAMOND BRITE** as September 31, 1991 and has continuously used the same to date. See Exhibit A. SGM obtained its **DIAMOND BRITE** federal trademark registration on March 16, 1993, and was granted incontestable status on February 1, 1999. Id. The mark was renewed on May 17, 2003. Thus, the **DIAMOND BRITE** mark is a distinctive mark registered on the Principal Register.

### b. Amount, Volume, and Geographic Extent of Sales

Commensurate with the amount, volume, and geographic extent of its advertising, SGM's sales of its **DIAMOND BRITE** product have been extensive, dating back to at least as early as 1991. See Exhibits A and P to the SMF. SGM's long term nationwide distribution and sale of its **DIAMOND BRITE** product establishes that its mark possesses the requisite degree of recognition necessary to support and win a case under the ACPA. See Exhibit O to SMF.

---

[2] Such factors include: "(i)The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties. (ii) The amount, volume, and geographic extent of sales of goods or services offered   under the mark. (iii) The extent of actual recognition of the mark. Whether the mark was registered . . . on the principal register." 15 U.S.C § 1125(c)(2)(A)(i) – (iv).

c.     There is ample evidence of actual recognition of the mark.

A Brand Study was conducted in 2003 by Readex, a nationally recognized independent research company located in Minnesota. Id. This was sponsored by Hanley-Wood, LLC. Id. at 3. The research provided a profile of the market's awareness, use, and opinions of specialty finishes for pools. Id. The survey sample represented 2,600 POOL & SPA NEWS recipients. Id. at 4. According to the report, the top three brands are 3M, SGM, and Aquavations. Id. at 7. SGM has a percentage greater than or equal to 3M in the Northeast, Midwest, and South markets. Id. at 9. Although, 3M had a higher percentage as to brand familiarity, SGM had a higher percentage regarding the number of users in the past 2 years of the study i.e. 2001. Id. at 7. Specifically, SGM had a higher percentage in all of the markets. Id. at 10. The Brand Report evidenced the high degree of recognition of SGM's **DIAMONDBRITE** mark illustrating that it is famous.

"[D]istinctiveness refers to inherent qualities of a mark and is a completely different concept from fame." Omega S.A., 228 F. Supp 2d at 121. As noted above, SGM's **DIAMOND BRITE** trademark is incontestable. "A registered trademark rendered incontestable by virtue of an affidavit filed under 15 U.S.C. § 1065 entitles the subject mark to a presumption that it is inherently distinctive." See Omega S.A., 228 F. Supp 2d at 122; see also Sporty's Farm, 202 F.3d 489 at 497; Equine Techs., Inc. v. Equitech., Inc., 68 F.3d 542, 545 (1st Cir. 1995). As such, the **DIAMOND BRITE** mark is distinctive with the meaning of the ACPA. Since no trier of fact could return a verdict for 3M on this element, SGM is entitled to summary judgment such that SGM's **DIAMOND BRITE** mark is distinctive for purposes of the ACPA.

ii)     **3M's diamondbrite.com domain name is not only confusingly similar to SGM's DIAMOND BRITE trademark; it is Identical**

The second element under the ACPA is that the domain name is either confusingly similar or identical to the plaintiff's mark. See Bavaro Palace, S.A., 203 Fed. Appx. at 256. As in Sporty's, SGM's **DIAMOND BRITE** trademark is virtually identical to 3M's diamondbrite.com domain name, with the exception of a space. In Sporty's, the mark and the domain name were virtually identical Sporty's vs. Sportys. Sporty's Farm, 202 F.3d at 498. When evaluating whether a domain name is confusingly similar to a trademark, a district court disregards the top-level domain name (e.g. ".com," ".org," ".net"). See Omega S.A., 228 F. Supp 2d at 126 (citing Sporty's Farm, 202 F.3d at 497-498). Since SGM's **DIAMOND BRITE** trademark and 3M's diamondbrite.com domain name are identical for purposes of the ACPA, SGM is entitled to summary judgment.

Even if this Court determines that SGM's trademark is not identical to 3M's domain name for purposes of the ACPA, 3M's diamondbrite.com domain name is confusingly similar to SGM's **DIAMOND BRITE** trademark. Under the ACPA the standard for determining whether a domain name

is confusingly similar is different from that used to determine 'likelihood of confusion' for trademark infringement. See Sporty's Farm, 202 F.3d at 498 n. 11 (citing Wella Corp. v. Wella Graphics, Inc., 37 F.3d 46, 48 (2nd Cir. 1994). Pursuant to Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492 (2nd Cir. 1961), courts examine likelihood of confusion by reference to the respective products of the parties, whereas, pursuant to the ACPA, the court must determine whether a domain name is confusingly similar to a trademark **without regard to the goods and services of the parties**. See Omega S.A., 228 F. Supp 2d at 126 (citing Sporty's Farm, 202 F.3d at 498 n. 11). In Sporty's Farm the Second Circuit concluded "without hesitation" that sporty's.com was confusingly similar to "sporty's" under the ACPA.  Sporty's Farm, 202 F.3d at 498. According to McCarthy, "[i]n the cybersquatting context, 'confusingly similar' must simply mean that the plaintiff's mark and the defendant's domain name are so similar in sight, sound, or meaning that they could be confused."  McCarthy at § 25:78. When comparing 3M's domain name without the top-level domain name ie. ".com," both SGM's **DIAMOND BRITE** trademark and 3M's "diamondbrite" domain name are clearly similar, which will cause confusion among consumers. Even if this Court finds that the mark and the domain name are not identical, they are confusingly similar for purposes of the ACPA.  Thus, SGM is entitled to summary judgment.

    iii)    **3M has used the diamondbrite.com domain name with a bad faith intent to profit.**

The third element is that the "defendant acted with a bad faith intent to profit." Omega S.A., 228 F. Supp 2d at 130-31; See also Bavaro Palace, S.A., 203 Fed. Appx. at 256.[3] The Court may consider all relevant factors and is not limited to the nine listed factors in determining whether the bad faith criteria

---

[3]In determining whether a person has a bad faith intent, a court may consider factors such as, but not limited to-

    (I)  the trademark or other intellectual property rights of the person, if any, in the domain name;

    (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

    (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

    (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

    (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

    (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

    (VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

    (VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of the domain names, without regard to the goods or services of the parties; and

    (IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c).

has been met.  <u>Victoria's Cyber Secret</u>, 161 F. Supp. 2d at 1347 (seven of the nine statutory factors weighed in favor of a finding of bad faith); <u>see also</u> <u>Eurotech</u>, 213 F. Supp. 2d at 626 (summary judgment in favor of mark owner where five of the nine ACPA statutory factors were clearly satisfied and the "big picture" was fully consistent with a finding of bad faith); <u>Cable News</u>, 177 F. Supp. 2d at 527 (6 of 9 statutory factors supported claim of bad faith); <u>Mattel</u>, 2001 U.S. Dist. LEXIS 13885 (5 factors favored a finding of bad faith and one other "tipped slightly" in favor of trademark owner); <u>Sporty's Farm</u>, 202 F.3d at 389. When this Court views the "big picture" of 3M's activities over the past couple of years, i.e., re-registration of the domain name, use of SGM's federally registered trademark in a Google Adwords campaign, and ability to monitor traffic of visitors to the accused domain name, SGM is confident that the Court will make a finding of bad faith.

A critical factor in determining bad faith is defendant's intent to divert consumers to a website that "could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site." 15 U.S.C. § 1125(d)(1)(B)(i)(V); <u>see also</u> <u>Harrods Ltd. v. Sixty Internet Domain Names</u>, 302 F.3d 214, 237 (4th Cir. Va. 2002)("Because this evidence is so convincing, Factor (V) standing alone supports the district court's finding of bad faith intent on the part of Harrods BA."); <u>Nike, Inc. v. Circile Group Internet</u>, 318 F. Supp. 2d 688 (N.D. Ill. 2004)(6 factors supported the finding of bad faith). 3M has admitted to having diverted traffic from the accused domain to its own domain. <u>See</u> Exhibit L to SMF. Further, since 3M has no legitimate trademark rights in **DIAMOND BRITE** its continued maintenance of and renewal of the website creates a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site. Any person reasonably sophisticated could conduct a "Whois" search of <u>www.diamondbrite.com</u> and find that 3M and not SGM owns the domain name. Since SGM's trademark is distinctive in the industry, consumers and industry professionals would certainly question why SGM's competitor owns the domain name for SGM's number one product.

3M admits that it became aware of the existence of SGM's **DIAMOND BRITE** product at least as early as the mid-1990s. <u>See</u> Exhibit C to SMF. SGM started using the mark **DIAMOND BRITE** at least as early as 1991, and subsequently obtained its federal registration in 1993, thereby putting 3M on constructive notice of its trademark rights. <u>See</u> Exhibit A. The **DIAMOND BRITE** mark was subsequently registered and renewed. 3M purchased the domain name diamondbrite.com from AESC on November 24, 2000. Shortly thereafter 3M decided that the business would not continue to use the AESC Marks. <u>See</u> Exhibit C Nos. 2 & 7. By abandoning any and all rights that it had in the AESC Marks, 3M abandoned any legitimate interests it may have had in the diamondbrite.com domain name.

3M deactivated the www.diamondbrite.com website in early 2002. Id. Instead of canceling diamondbrite.com or otherwise allowing same to expire, 3M instructed its registrars (Register.com, CSC, and Mark Monitor) to renew the domain name registration for diamondbrite.com domain name on December 6, 2000, March 29, 2002, September 25, 2003, and March 13, 2005. The 2005 registration was approximately a month after SGM sent its first cease and desist letter. 3M even re-registered the domain name again on December 21, 2007, a few months after the Complaint was filed in this matter. See Exhibit C to SMF, No. 9. 3M subsequently transferred its domain name diamondbrite.com from CSC to Mark Monitor in early 2008 and renewed the domain name for a **Sixth** time on February 21, 2008. Id.

3M used and continues to use the diamondbrite.com domain name in bad faith. 3M's decision not to use the AESC marks, coupled with the fact that the diamondbrite.com domain name does not consist of the legal name of the entity or any products owned by 3M (factor no. 2), that 3M has not used the website www.diamondbrite.com in connection with the bona fide offering of any goods or services (factor no. 3) leads to the inevitable conclusion that 3M acted in bad faith in continuing to renew the diamondbrite.com domain name.

According to 3M, once the AESC acquisition had been communicated to customers and prospective customers of AESC and the Traffic Control Materials Division, and the necessary content harvested from the AESC website, there was **no need** to display content on the www.diamondbrite.com website. Id. Rather than abandoning the domain name or letting it expire, 3M renewed the diamondbrite.com domain name registration approximately six (6) times, one of which occurred approximately a month after SGM sent out the first cease and desist letter. Most telling of 3M's bad faith motivation is a recent admission by 3M in an answer to interrogatories. Specifically, 3M admitted that it had **no need** to display content on the website but "continue[ed] to renew the domain name registration for diamondbrite.com because . . . it did not want to take the risk that a competitor of the division's retroreflective sheeting products, which are marketed and sold under the valuable and well-known brand DIAMOND GRADE could obtain the domain name and use it to create confusion among customers and potential customers as to the source of that competitor's retroreflective sheeting products."[4] Id. at 8. Clearly 3M does not have a bona fide noncommercial or fair use of the mark in the

---

[4] It is ironic that 3M is asserting this position since in an analogous matter 3M stated that such an action of warehousing domain names is tantamount to bad faith for purposes of the ACPA.  While the Panel ultimately did not take 3M's position, in Minnesota Mining and Manufacturing Company v. Mark Overbey, WIPO Case No. D2001-0727, the Registrant (referred to as "Respondent" in the case) Overbey, had reserved a series of domain names that were found by the Panel to be confusingly similar to and therefore likely infringements of a number of trademarks owned by 3M. These included 3mtapes.com, 3mabrasives.com and 3madhesives.com.  Specifically, 3M's position in regard to the "passive holding" issue was stated by the panel thusly:

website www.diamondbrite.com (factor no. 4). The evidence demonstrates that 3M recognizes the importance of owning and controlling domain names to avoid a competitor from doing so, and in fact has an express corporate policy in this regard. See Exhibit C to SMF, No. 8.

Not only does 3M's control of the diamondbrite.com domain name prevent SGM from registering it, it also allows 3M to monitor the viability and value of Internet traffic, the number of "hits," as well as the geographic location of all or most of the "hits" in order to determine strategic commercial information. See Exhibit H. For instance, even though 3M states that the domain is "inactive," even an inactive site, and most definitely an active site, would allow 3M to utilize this information to allocate its advertising budget and, thereby obtain an unfair commercial advantage. While 3M claims that it cannot monitor the Internet traffic to the diamondbrite.com domain or the number of "hits" received by the website, 3M uses Nuestar Ultra DNS to maintain its domains. Id. The service used by 3M, allows a domain name owner to monitor hits and analyze traffic. Id. This is true even of dormant websites so long as the website generates sufficient monthly "hits." Id.

As further evidence of 3M's bad faith SGM points out 3M's registration or acquisition of a multitude of domain names such as: snapseal.com.au, 3mambassadorsclubdubai.com, 3matomix.com, 3mbelieveitornot.com, 3m-iluma.com, 3mmetrosoft.biz, 3mmetrosonic, koyote.at, diamondproductionsinc.biz, entrex.com, ergotouch.biz, goodskin.org, hiland.biz, jennairfilters.com, maytagfilters.com, spydernet.com.br, tcm.com and toyotagraphics.com, all consisting of distinctive marks of others which 3M has no legitimate rights to use.[5] The obvious conclusion is that 3M registers and maintains such domain names deliberately to prevent their use by the legitimate trademark owners (factor no. 8). SGM's mark is but another distinctive mark that 3M has unlawfully prohibited the rightful trademark owner from using as a domain name (factor no. 9).

---

*The Complainant further contends that the Respondent registered and is using the disputed domain names in bad faith. The Respondent's registration of the domain names has been made with the purpose of preventing the Complainant from reflecting the mark in corresponding domain names – in order to force 3M to transfer-for-price negotiations. The Respondent is alleged to have engaged in a "pattern of such conduct" and the Complainant draws attention to two Decisions by Panels under the Policy which allegedly held that prevention of reflecting the mark of the Complainant in a domain name is evidence of bad faith, even if there is no evidence that the Respondent has engaged in a "pattern of such conduct." [Pharmacia & Upjohn Company v. Moreonline, D2000-0134 (WIPO April 19, 2000); Banco de Brasil S.A. v. Sync Technology, D2000-0727 (WIPO September 1, 2000)]. The Complainant contends that these decisions state that the passive holding of a confusingly similar domain name by a party without any legitimate interest is evidence of bad faith. In this case, the Respondent has acted more egregiously than required by the above decisions, because he engaged in a "pattern of such conduct" as is evidenced by the fact that he registered not only one confusingly similar domain name, but three and that this type of abusive registrations is referred to as vertically abusive registrations. The Complainant goes on to allege that vertically abusive registrations indicate a "pattern" of preventing the Complainant from reflecting the mark in corresponding domain names, evidencing bad faith . . . .*

[5] SGM realizes that discovery on these domain names is not complete. However, based on SGM's investigation, 3M does not have legitimate trademark rights in and to any of the domain names.

3M has used and is currently using the diamondbrite.com domain with a bad intent to profit. Therefore, since SGM has established all three elements necessary to prove a violation of the ACPA, this Court should grant summary judgment in its favor.

**C.      Unfair Competition – Count I**

For nearly all of the same reasons that 3M is liable under the ACPA as set forth above, SGM believes that summary judgment is appropriate for 3M's unfair competition.

The Lanham Act was intended "to protect persons engaged in . . . commerce against unfair competition." Dastar Corp., v. Twentieth Century Fox Film Corp., 539 U.S. 23, 28 (2003). Accordingly, §43(a) of the Lanham Act creates a "federal cause of action for unfair competition." Optimum Technologies, Inc., 496 F.3d at 1247 (quoting Univ. of Fla. V. KPB, Inc., 89 F.3d 773, 775 (11th Cir. 1996)). Specifically, §43(a) of the Lanham Act provides,

> Any person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof . . . which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action . . . .

15 U.S.C. 1125(a). The essence of unfair competition is likelihood of confusion. Optimum Technologies, Inc., 496 F.3d at 1239; see also Utah Lighthouse Ministry v. Foundation for Apologetic Information and Research, 2008 LEXIS 11523, *5 (10th Cir. 2008)("Trademark infringement is a type of unfair competition; the two claims have virtually identical elements and are properly addressed together as an action brought under *15 U.S.C. § 1125(a)(1)(B)*, § 43 of the Lanham Act."); YKK Corp. v. Jungwoo Zipper Co., 213 F. Supp. 2d 1195, 1198 (C.D. Cal. 2002)(citing Grey v. Campbell Soup Co., 650 F. Supp. 1166, 1173 (C.D. Cal. 1986), *aff'd* 830 F.2d 197 (9th Cir. 1987); Brookfield Communications, Inc, 174 F.3d at 1053 (citing 15 U.S.C. § 1125(a)). "[T]rademark law, by preventing others from copying a source-identifying mark . . . helps assure a producer that it (and not an imitating competitor) will reap the financial, reputation-related rewards associated with a desirable product." Brookfield Communications, Inc, 174 F.3d at 1053 (quoting Qualitex Co. v. Jacobson Products Co., 514 U.S. 159, 163-164 (1995)). Therefore, infringement law protects consumers from being misled by the use of infringing marks and also protects producers from unfair practices by an "imitating competitor." Qualitex Co., 514 U.S. at 163-164.

To prevail on an unfair competition claim, "the registrant must show that (1) its mark was used in commerce by the defendant without the registrant's consent and (2) the unauthorized use was likely to cause confusion, to cause mistake, or to deceive." Optimum Technologies, Inc., 496 F.3d at 1241 (citing Burger King Corp. v. Mason, 710 F.2d 1480, 1491 (11th Cir. 1983)). Accordingly, the first step of a

trademark infringement action is to demonstrate an unauthorized "use" of the plaintiff's mark in commerce.  Id.; see also SunAmerica Corp. v. Sun Life Assurance Co. of Canada, 77 F.3d 1325, 1343-44 (11th Cir. 1996)(the "starting point" of a Lanham Act claim is plaintiff's enforceable rights in the mark and that the defendants engaged in a "use" of the mark). If such an unauthorized "use" is shown by the plaintiff, the first prong of a trademark infringement action has been satisfied. See Burger King, 710 F.2d at 1491.

>           i)      **3M is "using" SGM's DIAMOND BRITE mark in commerce without SGM's authorization and/or consent**

SGM never authorized 3M to use its trademark in any manner, and certainly not in connection with a domain name. Apart from no consent, it is clear the 3M is "using" SGM's trademark in commerce. Throughout this litigation, 3M has repeatedly argued that it is has not engaged in unfair competition because it never "used" SGM's **DIAMOND BRITE** trademark in commerce. However, 3M's understanding of the term "use" is much too restrictive, and certainly is not in line with the case law interpreting the Lanham Act.

The Lanham Act defines "commerce" broadly for jurisdictional purposes as "all commerce which may lawfully be regulated by Congress." N. Am. Med. Corp. v. Axiom Worldwide, Inc., 522 F.3d 1211 (11th Cir. 2008); see also Bosley Med. Inst. V. Kremer, 403 F.3d 672, 677 (9th Cir. 2005) (describing "use in commerce" as a "jurisdictional predicate"); Planetary Motion, Inc. v. Techsplosion, Inc. 261 F.3d 1188, 1194-95 (11th Cir. 2001). To register a mark on the Principal Register, the mark must be "use[d] in commerce," meaning that the mark must be "placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto." See 15 U.S.C. § 1127. However, for infringement and unfair competition purposes, the "use" must be in connection with the sale or advertisement of the goods. N. Am. Med. Corp., 522 F.3d at 1218.  "[I]t is important to distinguish between the merely jurisdictional 'in commerce' requirement of 15 U.S.C. §1125, and the 'in connection with any goods and services' requirement [which] establishes a violation of section 43 of the Lanham Act," which we have here. Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research, (FAIR), 2008 U.S. App. LEXIS 11523 (10th Cir. 2008)(citing Bosley, 403 F.3d at 677). According to McCarthy, § 1127 "defines the kind of 'use' needed to acquire registrable trademark rights -- not to infringe them." J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:11.50 (4th ed. 2003). For infringement purposes, McCarthy observes that § 1114(1) merely requires that a plaintiff's proof of infringement establish a use in commerce "in connection with the sale . . . or advertising of any goods." Id. In Bosley Med. Inst., Inc., the Ninth Circuit held that the appropriate issue was whether the use was "in connection with the sale of goods or services." See also Playboy Enters., Inc. v. Netscape Commc'ns Corp., 354 F.3d 1020, 1024 n.11 (9th Cir. 2004).  Further,

> It is sometimes argued that before there can be an infringing use in violation of the Lanham Act, the accused use must be "use as a trademark." That is, the argument is made that as part of its prima facie case of infringement, the trademark owner must prove that the defendant is making use of the accused designation "as a trademark." The problem with this characterization is that the Lanham Act nowhere explicitly states that "use as a trademark" is required for an accused use to be an infringement.

<u>Vulcan Golf, LLC v. Google, Inc.</u>, 2008 U.S. Dist. LEXIS 22155 (N.D. Ill. 2008). Therefore, 3M's contention that it never "used" SGM's **DIAMONDBRITE** trademark is entirely without merit since its use of SGM's **DIAMONDBRITE** trademark is "in connection with the sale . . . or advertising of . . . goods," as discussed below.

a.   <u>3M has admitted to using SGM's trademark in Google Adwords</u>

3M admitted that in late 2001 and early 2002, and again in 2005 it purchased SGM's **DIAMOND BRITE** trademark for use as a *Google* ad word. <u>See</u> Exhibit L to SMF, No. 4. 3M admitted that, "[f]or a period of . . . four months sometime between October 2004 and February 2005, the business budgeted $500.00 per month . . . for the purchase of several *Google* ad words which **included "Diamond Brite."** <u>Id</u>. (emphasis added). Google Inc., operates an advertising program titled "AdWords," under which an account holder can "create ads and choose keywords." <u>Storus Corp. v. Aroa Mktg.</u>, 2008 U.S. Dist. LEXIS 11698 (N.D. Cal. 2008). By using the AdWords program, "[w]hen people search on Google using one of the account holder's keywords, the account holder's ad may appear next to the search results, and people can then click on the account holder's ad." <u>Id</u>.[6]  In fact, the most expensive Key Word is "Diamond Brite Pool" at an estimated $1.68 per click. Most of the suggested Google Adword Key Word include "Diamond Brite" along with other terms that clearly reference its association with the pool industry, such as: "diamond brite pool finish", "diamond brite pool plaster", "diamond brite plaster", "diamond brite colors", "diamond brite swimming", and the like. <u>See</u> Exhibit Q to SMF. Most telling, of course, is Google's suggested Key Word of "sgm diamond brite." <u>Id</u>. This supports the value of SGM's trademark to attract Internet hits, and its distinctiveness, specifically in association with products to the pool industry.  In fact, the most expensive Key Word is "Diamond Brite Pool" at an estimated $1.68 per click. Many suggested Key Words include the .com designation such as "www diamondbrite", "diamond brite com", which would of course be helpful for SGM to utilize to properly advertised and drive traffic to its site www.diamondbrite.com if it owned it. <u>Id</u>. This is the reality of the current marketplace, and this is why 3M should be forced to turn over

---

[6] To illustrate to the Court the significance of a trademark in the Internet context, SGM offers the following information which is readily available for public inspection at Google.com. <u>See</u> Exhibit Q to SMF. <u>Hartford Life Ins. Co. v. Rosenfeld</u>, 2007 U.S. Dist. LEXIS 55819, *25 (DC NJ 2007)(court took judicial notice of information obtained from Google.com)(citing to <u>Saco v. Tug Tucana Corp.</u>, 483 F.Supp.2d 88, n.4 (D. Mass 2007)(taking judicial notice of information obtained from www.mapquest.com)).

www.diamondbrite.com to SGM. See Rhino Sports, Inc. v. Sport Court, Inc., 2007 U.S. Dist. LEXIS 32970 (D.C. AZ. 2007)(generally discussing Google Adwords).

If 3M budgeted $500.00 per month for approximately five (5) months (October 2004-February 2005), depending on the specifics of the program at the time, could allow for "hits" from a mere few cents to a few dollars. See Exhibit M to SMF. Dividing the $500.00 budget by the cents or even the dollars would result in driving hundreds of Internet searches to 3M's website. All of this Internet traffic is the direct result of 3M's use of SGM's federally registered trademark **DIAMOND BRITE**, its main competitor.  See Exhibit O to SMF.

3M's Google Adwords activity was done with full knowledge of SGM's trademark rights. 3M is deemed to have constructive knowledge of SGM's trademark rights in its **DIAMOND BRITE** mark from the time the application was filed, namely 1992. See 15 U.S.C. § 1057(c). 3M admits that it had actual knowledge of SGM's **DIAMOND BRITE** product since at least the mid-1990s, well before it purchased "Diamond Brite" as a *Google* ad word, see Exhibit C at No. 13. Not only did 3M have knowledge about SGM's trademark rights in the **DIAMOND BRITE** trademark and the **DIAMOND BRITE** product prior to purchasing the *Google* ad words, it had already abandoned any and all rights to the AESC Marks. See Abandonment discussed *supra*. Worse, 3M was engaged in this activity at the height of this dispute which involved the exchange of demand letters.

3M's purchase of SGM's **DIAMOND BRITE** trademark as an AdWord constitutes "use" for purposes of unfair competition pursuant to the Lanham Act. Purchasing a trademarked term as a "keyword" as a Google Ad word meets the Lanham Act's "use" requirement. See Buying for the Home, LLC v. Humble Abode, LLC, 459 F. Supp. 2d 310 (D. N.J. 2006)(citing Edina Realty, Inc. v. Themlsonline.com, 2006 U.S. Dist. LEXIS 13775 (D. Minn. 2006)); see also Storus Corp., 2008 U.S. Dist. LEXIS 11698.[7] In Edina Realty, the defendant, a direct competitor of plaintiff, purchased from Google and Yahoo! search terms that were identical or similar to plaintiff's EDINA REALTY trademark. Edina Realty, Inc., 2006 U.S. Dist. LEXIS 13775, *2-*3.  The court found defendant's use of the mark constituted "use in commerce" under the Lanham Act, holding that:

> While not a conventional "use in commerce," defendant nevertheless uses the Edina Realty mark commercially. Defendant purchases search terms that include the Edina Realty mark to generate its sponsored link advertisement. Based on the plain meaning of the Lanham Act, **the purchase of search terms is a use in commerce**.

Id. at *3 (emphasis added)(citing Brookfield Communs., Inc., 174 F.3d at 1064). Accordingly, the Court in Buying for the Home LLC found that "Plaintiff has satisfied the "use" requirement of the Lanham

---

[7]At least one Court has opined that "the question whether trademark infringement occurs when an Internet search engine uses a trademarked term to generate "Sponsored Links" [or ad words] appears to be an open question in the Eleventh Circuit.  Rescuecom Corp. v. Computer Troubleshooters USA, Inc., 464 F. Supp. 2d 1263, 1266-1267 (11th Cir. 2005).

Act in that Defendants' alleged use was "in commerce" and was "in connection with any goods or services"." <u>Buying for the Home, </u>, 459 F. Supp. 2d at 323. In finding that the allegations clearly satisfy the Lanham Act's "use" requirement, the court noted that

> the alleged purchase of the keyword was a commercial transaction that occurred "in commerce," trading on the value of Plaintiff's mark. Second, Defendants' alleged use was both "in commerce" and "in connection with any goods or services" in that Plaintiff's mark was allegedly used to trigger commercial advertising which included a link to Defendants' furniture retailing website.

<u>Id</u>. Since 3M admits to purchasing SGM's **DIAMOND BRITE** trademark as a *Google* AdWord, as recently as 2005, it has "used" SGM's **DIAMOND BRITE** trademark for purposes of unfair competition pursuant to the Lanham Act.

Not only has 3M utilized SGM's **DIAMOND BRITE** trademark as a *Google* ad word, worse, it is using SGM's trademark as its domain name. Use of a trademark in a domain name constitutes "use in commerce." <u>See</u> <u>PACAAR, Inc. v. Telescan Techs., LLC</u>, 319 F.3d 243, 250 (6th Cir. 2003)(holding that defendant's use of domain names such as "peterbilt-trucks.com" and "kenworthnewtrucks.com" violated plaintiff's trademark rights in the marks "Peterbilt" and "Kenworth"); <u>Brookfiled Communications, Inc.</u>, 174 F.3d at 1036 (holding that the defendant's use of the domain name "moviebuff.com" violated plaintiff's trademark rights in the mark "MovieBuff"). These courts have all relied on the fact that domain names usually signify source.   <u>See</u> <u>PACCAR</u>, 319 F.3d at 250. The PACCAR Court noted: "words in many domain names can and do communicate information as to the source or sponsor of the web site." <u>Id</u>.

In an analogous case, the Fourth Circuit found that by using a mark in a domain name a defendant is considered to be using the mark "in connection with" goods and services thus preventing users from obtaining or using the registrant's goods or services. <u>See</u> <u>Doughney</u>, 263 F.3d at 365. In <u>Doughney</u>, the plaintiffs owned a federal trademark registration for the mark "PETA."   <u>Id</u>. at 363. The defendant, on the other hand, registered the domain name <u>www.peta.org</u> in 1995. <u>Id</u>. Subsequently, the plaintiff requested that the defendant voluntarily transfer the domain name <u>www.peta.org</u> because the plaintiff owned the federal registration for the mark "PETA," which it registered in 1992. <u>Id</u>. Upon refusing to voluntarily transfer the domain name, the plaintiff sued defendant for service mark infringement, unfair competition, dilution and cybersquatting. <u>Id</u>.

As in the instant matter, the defendant claimed that he did not use the mark "PETA" in connection with goods and services and that he did not use it in a manner engendering a likelihood of confusion. <u>Id</u>. at 365. However, the court found that "[t]o use PETA's Mark 'in connection with' goods or services, Doughney need not have actually sold or advertised goods or services on the <u>www.peta.org</u> website. **Rather, Doughney need only have prevented users from obtaining or using PETA's goods**

**or services**" via the Internet. Id. (emphasis added); see also OBH, Inc. v. Spotlight Magazine, Inc., 86 F. Supp. 2d 176, 183 (W.D.N.Y. 2000)(website parodying the Buffalo News under the domain name "thebuffalonews.com" was commercial because the website was "likely to prevent or hinder Internet users from accessing plaintiffs' services on plaintiffs' own web site"); Planned Parenthood Fed'n of Am., Inc. v. Bucci, 1997 LEXIS 3338, *3 (1997) aff'd, 152 F.2d 920 (2d Cir. 1998)(finding a website criticizing Planned Parenthood policies and using the domain name "plannedparenthood.com" was commercial in nature because it would frustrate users and prevent them from reaching the Planned Parenthood website."). Further, the Fourth Circuit adopted the reasoning used in both OBH, Inc. and Planned Parenthood Fed'n of Am., Inc. and found that:

> Doughney's use of PETA's Mark in the domain name of his website is likely to prevent Internet users from reaching [PETA's] own Internet web site. The prospective users of [PETA's] services who mistakenly access Defendant's web site may fail to continue to search for [PETA's] own home page, due to anger, frustration, or the belief that [PETA's] home page does not exist.

Doughney, 263 F.3d at 366.

That is precisely the situation we have here. In the instant matter, SGM owns an incontestable federal trademark registration for the mark **DIAMOND BRITE**. See Exhibit A and B to SMF. However, its direct competitor, 3M, being fully aware that SGM owned a valid and subsisting federal trademark registration for the mark **DIAMOND BRITE**, acquired the registration for the diamondbrite.com domain name and thereafter continued to re-register and traffic in it. See Exhibit C to SMF, No. 2. Moreover, at one time the diamondbrite.com website actually re-directed traffic to 3M's website. Id. at No. 3. Even after the cancellation of the AESC mark and 3M's abandonment of any trademark rights in the term "DIAMOND BRITE" 3M continued to renewed the registration for the domain name www.diamondbrite.com being fully aware that its main competitor, SGM, the incontestable federal trademark registration for the mark **DIAMOND BRITE**. 3M can not offer any valid excuse or reasoning for doing so. It is clear that its actions were designed to prevent SGM from utilizing the valuable domain name diamondbrite.com. In response to Interrogatory No. 8, **3M stated that it maintains the domain so that a competitor could not use it**. Id. at No. 8.

As in Doughney, OBH, Inc. and Planned Parenthood Fed'n of Am., Inc., 3M's unauthorized use of SGM's trademark **DIAMOND BRITE** in the domain name www.diamondbrite.com will not only prevent consumers from obtaining or using SGM's goods and services, but it will also continue to cause prospective users of SGM's **DIAMOND BRITE** products, who mistakenly access 3M's web site, to stop searching for SGM's web site due to confusion or frustration. See Doughney, 263 F.3d at 365 (quoting OBH, Inc., 86 F. Supp. 2d at 176). Therefore, such users, who are looking for the exposed quartz aggregate finishes for swimming pools provided by the SGM on its website, may instead opt to

select 3M's "COLORQUARTZ" product for their pool contained in 3M's web site. See Doughney, 263 F.3d at 365 (quoting OBH, Inc., 86 F. Supp. 2d at 176). 3M's action in appropriating SGM's mark in its domain name not only has a connection to SGM's distribution, sale or advertising of its goods and services thereby satisfying the Lanham Act "use" requirement.

> ii)     **3M's unauthorized use of SGM's DIAMOND BRITE mark in its domain name is likely to cause confusion, to deceive, and/or to cause mistake among potential customers in violation of the Lanham Act.**

Under Optimum Technologies, Inc., the second prong in the unfair competition analysis is that unauthorized use is likely to cause confusion, to cause mistake, or to deceive.  496 F.3d at 1241 (citing Burger King Corp., 710 F.2d at 1480) (emphasis added). Courts consider the following seven factors in assessing whether or not a likelihood of confusion exists: (1) type of mark; (2) similarity of mark; (3) similarity of the products the marks represent; (4) similarity of the parties' retail outlets (trade channels) and customers; (5) similarity of advertising media; (6) defendant's intent; and (7) actual confusion. Frehling Enters., Inc. v. Int'l Select Group, Inc., 192 F.3d 1330, 1335 (11th Cir. 1999). "[T]he plaintiff need not prevail on all seven factors to support a claim of trademark infringement." E.R. Squibb & Sons, Inc. v. Princeton Pharm., Inc., 17 U.S.P.Q.2D 1447, 1451 (S.D. Fla. 1990).  Most importantly, "[t]he taking of an identical copy of another's famous and distinctive trademark for use as a domain name creates a presumption of confusion among Internet users as a matter of law." Victoria's Cyber Secret Limited Partnership, 161 F. Supp. 2d at 1352 (citing People for the Ethical Treatment of Animals v. Micheal T. Doughney, 113 F. Supp. 2d 915, 920 (E.D. Va. 2000)). Alternatively, a likelihood of confusion can be found as a matter of law if plaintiff shows that defendants intended to derive benefit from plaintiff's trademark. Seiko Kabushiki Kaisha v. Swiss Watch Int'l, Inc., 188 F. Supp. 2d 1350, 1354 (S.D. Fla. 2002)(citing Babbit Elec., Inc. v. Dynascan Corp., 38 F.3d 1161, 1179 (11th Cir. 1994)); see also E.R. Squibb & Sons, Inc. v. Princeton Pharmaceutical, Inc., 1990 U.S. Dist. LEXIS 18598 (S.D. Fla. 1990)(Court found sufficient persuasive and unopposed circumstantial evidence that the defendants chose their mark with the intent of deriving benefit from the goodwill generated by the plaintiff's mark); Varitronics Systems, Inc., v. Merlin Equipment, Inc., 682 F. Supp 1203, 1206 (S.D. Fla. 1988)(if a defendant's intent to derive benefit from a plaintiff's distinctive mark is clear and unrebutted by evidence to the contrary, intent alone, without consideration of the other factors, may support a finding of trademark infringement.).

By utilizing SGM's **DIAMOND BRITE**, 3M has created a likelihood of confusion in the general sense of that phrase, and most certainly initial interest confusion. "Initial interest confusion occurs when the defendant uses the plaintiff's trademark in a manner calculated to capture initial consumer attention, even though no actual sale is finally completed as a result of the confusion."

nterstellar Starship Services, Ltd. v. Epix Inc., 304 F. 3d 936, 941 (9th Cir. 2002). For example, initial interest confusion can occur where a defendant includes a plaintiff's mark in "metatags" found on the defendant's website, thereby causing consumers who enter the plaintiff's mark into a search engine to obtain a list of results that includes the defendant's website, after which some of those consumers will select defendant's website from the list. See Brookfield, 174 F. 3d at 1062-65 (Lanham Act bars defendant from including in its metatags any term confusingly similar with plaintiff's mark). "Although there is no source confusion in the sense that consumers know they are patronizing [defendant] rather than [plaintiff], there is nevertheless initial interest confusion in the sense that, by using [plaintiff's mark] to divert people looking for [plaintiff's product] to its web site, [defendant] improperly benefits from the goodwill that [plaintiff] developed in its mark." North America Medical Corp., 522 F.3d at 1221 (citing Brookfield, 174 F.3d at 1064).

Although 3M owns a federal registration for the mark "COLORQUARTZ," a product competing with SGM's **DIAMOND BRITE** products, it maintains the diamondbrite.com domain name; thereby preventing SGM, the entity with legitimate trademark rights to the domain name, from utilizing it. This domain name is clearly likely to cause confusion with SGM's **DIAMOND BRITE** trademark. As noted earlier, SGM's trademark **DIAMOND BRITE** registration is incontestable and therefore distinctive. Moreover, once a mark is incontestable its validity, legal protectability, and ownership are presumed. Commerce Nat. Ins. Services, Inc. v. Commerce Ins. Agency, Inc., 214 F.3d 432, 438 (3d Cir. 2000). Since SGM's mark is incontestable, distinctive, and in long and continuous use, it is a strong mark. (element 1).

Furthermore, the mark contained in 3M's diamondbrite.com domain name is not only similar to SGM's "**DIAMOND BRITE**" trademark, it is identical. (element 2).

3M has admitted that it sells an aggregate product to swimming pool finish manufacturers and applicators and that SGM has an aggregate swimming pool finishing product known as **DIAMOND BRITE**. Accordingly, both companies sell identical products. See Exhibit G to SMF, Nos. 38 & 39. (element 3). 3M admits that it sells its products in the same trade channels as SGM. See Id. at 40. (element 4). "When both parties use the same marketing channels to advertise and sell their goods, it exacerbates the potential for confusion." Garden of Life, Inc. v. Letzer, 318 F. Supp. 2d 946, 965 (C.D. Cal. 2004). Additionally, since SGM and 3M are direct competitors in the pool industries, it is only natural that both companies utilize the same type of media/trade journals to advertise. (element 5). The existence of the aforementioned Brand Study confirms this. See Exhibit O to SMF.

It is clear that 3M has the ability to utilize SGM's mark to divert and/or redirect consumers to 3M's product (element 6). Therefore, 3M's domain name clearly is likely to cause confusion with SGM

since it misrepresents SGM's **DIAMOND BRITE** mark. <u>See</u> <u>Victoria's Cyber Secret Limited Partnership</u>, 161 F. Supp. 2d at 1345 (finding that defendant's four domain names victoriasexsecret.com, victoriassexsecret.com, victoriasexysecret.com and victoriassexysecret.com were confusingly similar to plaintiff's "VICTORIA'S SECRET" trademark); <u>Public Serv. Co. v. Nexus Energy Software, Inc.</u>, 36 F.Supp.2d 436 (D. Mass 1999)(finding "Energy Place" and "energyplace.com to be virtually identical for trademark purposes). Courts generally have held that "a domain name that incorporates a trademark is confusingly similar to that mark if consumers might think that [the domain name] is used, approved, or permitted by the mark holder." <u>DaimlerChrysler v. Net Inc.</u>, 388 F.3d 201, 205-206 (6th Cir. 2004)(<u>citing</u> <u>Ford Motor Co. v. Greatdomains.com, Inc.</u>, 177 F. Supp. 2d 635, 641 (E.D. Mich. 2001); <u>see</u> <u>also</u>  <u>Omega S.A.</u>, 228 F.Supp.2d at 127. Accordingly, since SGM has established that 3M has used the **DIAMOND BRITE** trademark in its domain name diamondbrite.com without SGM's consent or without any legitimate reasons and such use is likely to cause confusion among customers since 3M's domain name is identical to SGM's **DIAMOND BRITE** trademark, this Court should grant summary judgment in favor of SGM.

**CONCLUSION**

3M long abandoned any rights that it may have had in the subject trademark as confirmed by its admissions. Despite having no trademark rights to the "DIAMOND BRITE" trademark, 3M continued to renew the diamondbrite.com domain name over the course of years, and has admitted that its sole reason for renewing the diamondbrite.com domain name was so that its competitors could not obtain the domain name. Worse still, 3M has admitted that it has used SGM's federally registered trademark in a Google Adwords campaign as recently as 2005.   Therefore, not only is 3M engaged in unfair competition by utilizing the diamondbrite.com domain name, it is engaging in conduct that the ACPA was designed to prevent, i.e. the use of a domain name with the bad faith intent to profit therefrom based upon.

**WHEREFORE,** Plaintiff Southern Grouts & Mortars, Inc. respectfully requests that this Court enter an Order granting Summary Judgment in favor of Southern Grouts & Mortars, Inc. and any additional relief that this Court deems just and proper.

Dated June 27, 2008

Respectfully submitted,

By:    s/ FRANK HERRERA

Scott W. Rothstein, Esq.
Florida Bar No. 765880
Frank Herrera, Esq.
Florida Bar No. 494801
JanPaul Guzman, Esq.
Florida Bar No. 16064
Gustavo Sardiña, Esq.
Florida Bar No. 31162
ROTHSTEIN ROSENFELDT ADLER
401 East Las Olas Blvd., Suite 1650
Fort Lauderdale, Florida 33301
Telephone: (954) 522-3456
Facsimile: (954) 527-8863
Email: fherrera@rra-law.com
**Counsel for Plaintiff**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 27th day of June, 2008, I electronically filed the forgoing document with the Clerk of Court using CM/ECF.  I also certify that the foregoing is being served this day upon all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

Respectfully submitted,

By:    s/JanPaul Guzman

Scott W. Rothstein
Frank Herrer
JanPaul Guzman

**SERVICE LIST**
Southern Grouts & Mortars, Inc. v. 3M Company
CASE NO.: 07-61388-CIV-COOKE/Bandstra
**United States District Court, Southern District of Florida**

Mark A. Romance, Esq.,
RICHMAN GREER, P.A.,
Miami Center – Suite 100,
201 South Biscayne Blvd,
Miami, Florida 33131,
Tel: 305-373-4000
Fax: 305- 373-4099
Email:mromance@richmangreer.com
*Via CM/ECF*

Scott W. Rothstein, Esq.
Frank Herrera, Esq.
Gustavo Sardiña, Esq.
JanPaul Guzman, Esq.
ROTHSTEIN ROSENFELDT ADLER
Counsel for Defendant
401 East Las Olas Boulevard, Suite 1650
Fort Lauderdale, Florida  33301
Tel:     (954) 522-3456
Fax:     (954) 527-8663
E-mail:  fherrera@rra-law.com
*Via CM/ECF*

Laura J. Hein, Esq.,
GRAY PLANT MOOTY,
500 IDS Center,
80 South Eighth Street,
Minneapolis, Minnesota 55402
Tel: 612-632-3000
Fax: 612-632-4444
Email: laura.hein@gpmlaw.com
*Via CM/ECF*

Dean C. Eyler, Esq.
Gray Plant Mooty
500 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Tel: 612-632-3000
Fax: 612-632-4444
Email: dean.eyler@gpmlaw.com
*Via CM/ECF*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No.: 07-61388-CIV-COOKE/Bandstra**

SOUTHERN GROUTS & MORTARS, INC.,
A Florida corporation,

      Plaintiff,

v.

3M COMPANY,
a foreign corporation,

      Defendant.

_____ /

## ORDER

     THIS CAUSE came before the Court on the Plaintiff's Motion for Summary Judgment, (D.E. _____) filed on June 27, 2008.  Upon review of this motion, the court file and applicable law, it is hereby:

     ORDERED AND ADJUDGED that the relief sought is GRANTED as to Counts I and V of Plaintiff's Second Amended Complaint.  As Counts II, III, and IV have been voluntarily dismissed, further consideration of the merits is not required.

     DONE AND ORDERED in Chambers, at Miami Florida this _____ day of _____, 2008.

                          _____
                          United States District Judge

Copies furnished to:
All Counsel of record