UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

CASE NO. 07-61388-CIV COOKE/BANDSTRA

SOUTHERN GROUTS & MORTARS, INC.,
a Florida corporation,

                    Plaintiff,

vs.

3M COMPANY, a foreign corporation, a/k/a
MINNESOTA MINING AND
MANUFACTURING COMPANY,

                    Defendant.
_____/

## ORDER ON PARTIES' RESPECTIVE MOTIONS FOR SUMMARY JUDGMENT

**THIS MATTER** is before the Court upon Defendant 3M Company's Motion for

Summary Judgment [DE 96] and Plaintiff Southern Grouts & Mortars' Motion for Summary

Judgment [DE 99]. To manage this case as effectively as possible, this Court, upon a review of

the record, ordered SGM to respond to 3M's affirmative defenses of laches, waiver, or estoppel

[DE 70]. After review and consideration of SGM's response, and 3M's subsequent reply, 3M

was ordered to file a motion for summary judgment. In the interim between that order and 3M's

filing of its Motion, Plaintiff voluntarily dismissed Counts II, III, and IV of its Second Amended

Complaint, all relating to dilution claims. Just one day after Defendant filed its Motion for

Summary Judgment, SGM filed its own Motion for Summary Judgment. Oral argument was

heard on September 10, 2008. Although the Motions are not titled as cross-motions for

summary judgment, because the issues overlap so thoroughly, and because I find that both of

SGM's claims are barred by laches, I choose to address both motions in one order.

I.      **Background**[1]

3M and SGM are competitors in the field of quartz aggregate products for surface finishes.  Specifically, 3M manufactures and sells COLORQUARTZ, and SGM manufactures and sells DIAMOND BRITE.  3M and SGM each own those respective, federally registered, trademarks.  Although SGM filed suit in this case in September, 2007, its Complaint deals with events beginning nearly eight years ago when 3M's acquired a domain name, "diamondbrite.com."  SGM, in its Second Amended Complaint alleges that 3M, through the use, re-registration, and in someways non-use, of diamondbrite.com, has violated the Lanham Act provisions against unfair competition, §43, 15 U.S.C. §1125(a),  as well as the Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. §1125(d)(1)(A).[2]

In 2000, in the interest of expanding its Traffic Control Materials Division ("TCM") (now known as Traffic Safety Systems Division, ("TSSD")) 3M purchased nearly all of the assets of American Electronic Sign Company ("AESC").  Among those assets were multiple patents and trademarks, including DIAMOND BRITE, and three domain names, including diamondbrite.com.  TSSD was, and is, a separate division from the division that manufactures and sells COLORQUARTZ.  3M slowly integrated AESC's business into TSSD, and continued to use the diamondbrite.com website.  By February 2001, the website included a graphic, alerting

---

[1]The facts here are taken from the parties' respective statements of material facts, and responses thereto.  As noted by 3M, SGM failed to abide by Local Rule 7.5(C) and respond specifically to 3M's enumerated paragraphs.  The effect of this, as made explicit in Local Rule 7.5(D), is that those uncontroverted facts will be deemed admitted so long as they are supported by the record.  Nonetheless, the Court has reviewed and considered Plaintiff's "Statement of Material Facts in Opposition to [3M's] Motion for Summary Judgment" with an eye toward determining which facts, if any, were controverted by SGM.

[2]SGM initially brought claims of dilution under both federal and state statutes, but subsequently withdrew them.

visitors of the acquisition with the text "3M Dynamic Message Systems, Formerly American Electronic Sign." Clicking on the graphic would route a visitor to 3M's TSSD webpage. Sometime in early 2002, visitors to www.diamondbrite.com were automatically re-directed to TSSD's webpage. Although the precise date has not been determined, 3M deactivated diamondbrite.com sometime between April and July, 2002, and the site has remained inactive[3] since that time. After the transition of products and customers from AESC to 3M was complete, 3M ceased using the DIAMOND BRITE trademark. In 2006, 3M allowed their federal registration of the mark to lapse. However, 3M has renewed the registration of the diamondbrite.com domain several times since its acquisition, including as late as December 21, 2007.

At least as early as July 16, 2002 (and possibly even a year earlier) SGM was aware of 3M's ownership, and the inactive status of, diamondbrite.com. On that date, SGM sent an email to 3M's Domain Name Administrator inquiring whether 3M would allow SGM to take the domain name. It is unclear from the record what, if any, response 3M transmitted in regard to that email, but the record does reflect that no other action was taken by SGM for nearly two-and-one-half years. On February 18, 2005, an attorney for SGM sent a cease and desist letter to 3M, claiming that 3M was using the diamondbrite.com domain, and demanding that 3M transfer the domain name to SGM. 3M refused to comply with SGM's demand and denied any wrongful conduct, but noted to SGM's attorney that it welcomed any questions, or evidence of SGM's

---

[3]There is some debate by the parties as to the meaning of "active" or "inactive" in the context of 3M's ability to monitor website activity and queries or "hits" to 3M owned websites. I use "inactive" here only to denote a website that is inaccessible to a would-be visitor; *e.g.*, typing www.diamondbrite.com into a web browser results in an error noting that no page could be displayed, or possibly, depending on the browser setup, a search result display listing alternative sites or spellings. Any discussion as to the other meaning of "inactive" in this case will be addressed *infra,* as needed.

claims.  Neither SGM's attorney, nor any other representative from SGM, replied to 3M.  Then, on July 2, 2007, SGM's current counsel sent another letter to 3M.  Therein, SGM's counsel acknowledged the 2005 letters, but did not explain the delay or any change in circumstances. 3M responded that its position remained unchanged.  No further communication from SGM or its counsel was received by 3M until the filing of this action.

## II.    Summary Judgment Standard

Summary judgment is proper when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue as to any material fact and compels judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Only the existence of a genuine issue of material fact, as opposed to a simple factual dispute, will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986).  "The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment."  *Clark v. Coats & Clark, Inc*.,  929 F.2d 604, 608 (11th Cir. 1991).  No genuine issue of material fact exists when the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  Moreover, "[t]he party opposing summary judgment may not simply rely on the pleadings or mere denials of the allegations. Rather, the opposing party must adduce some evidence showing that material facts are in issue."  *Byrnes v. Honda Motor Co.,*  907 F.Supp. 1525, 1527 (S.D.Fla. 1995) (citing *Anderson*, 477 U.S. at 256).

The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electronic Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 252.

## III.    Application of the Laches defense

It is necessary to address 3M's laches defense before any other arguments put forth by either side.

### A.    Laches bars the Unfair Competition claims

A defendant asserting laches must show: "(1) a delay in asserting a right or claim; (2) that the delay was not excusable; and (3) that there was undue prejudice  to the party against whom the claim is asserted." *Kason Indus. v. Component Hardware Group, Inc.*, 120 F.3d 1199, 1203 (11th Cir. 1997) (citing *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1545 (11th Cir. 1986)). Although the Lanham Act does not contain a statute of limitations, trademark cases within the Eleventh Circuit "appl[y] the period for analogous state law claims as the touchstone for laches." *Kason*, 120 F.3d at 1203.  The applicable limitations period here is four years.  *AmBrit*, 812 F.2d at 1546 (citing Fla. Stat. §95.11(3)).[4]  "[I]f the claim is filed after the analogous limitations

---

[4]Florida Statute §95.11 states in pertinent part:
Actions other than for recovery of real property shall be commenced as follows:

(3) Within four years.--

(p) Any action not specifically provided for in these statutes.

period has expired, the presumption is that laches is a bar to suit." *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 837 (9th Cir. 2002) (citing cases from the Second, Third, Fourth, Sixth, Seventh, and Eleventh Circuits).

### 1. Delay in asserting claim

There is no dispute that SGM knew of 3M's ownership of the diamondbrite.com domain name, and its inactive status, as early as July 16, 2002.  And, of course, there is no dispute that SGM failed to file suit until September 27, 2007.  In the time between, SGM sent one email and two letters to 3M, first asking if 3M would turn over the domain name, and then demanding that 3M do so.  As noted above, the email was sent July 16, 2002, with the first letter not dated until February 18, 2005, and the final letter not dated until July 2, 2007.  There is no evidence in the record as to 3M's responses to that initial email, but 3M clearly responded to the two letters, declining to relinquish the domain name, and asserting their right to it.  The record also reflects that SGM failed to follow-up in the two-and-one-half years between the email and the first letter, and the over two years between the first and second letters.

SGM's argument that this delay of over five years in filing suit should be tolled because "it acted diligently in attempting to resolve this matter with 3M and procure [the domain]" is belied by the record, and unsupported by the law.  Although Plaintiff is correct that time spent in a *good faith* attempt to settle the matter outside of the courts should not count toward laches, no such attempt was made here, and no negotiations, or even attempt to begin negotiations, were undertaken.  *See A.C. Aukerman Co. v. Miller Formless Co., Inc.*  693 F.2d 697, 700 (7th Cir. 1982) ("The general rule is that license negotiations do not necessarily push back the running of time in a laches defense.  *For such tolling the negotiations must ordinarily be continuous and*

6

*bilaterally progressing, with a fair chance of success, so as to justify significant delays.*")
(emphasis added) (internal citation omitted); 6 McCarthy on Trademarks and Unfair
Competition, §31:15 (stating that reasonable delay for settlement and negotiation purposes
should not count toward laches, and collecting cases).  There is no indication that SGM took any
steps beyond merely sending the email and letters.  Moreover, there is no reason given why
SGM waited over two-years between each contact with 3M.  SGM's three attempts over five
years simply do not constitute a serious attempt at settling the issue and therefore, tolling of the
limitations period is not justified.  *See Hot Wax, Inc. v. Turtle Wax, Inc.,* 191 F.3d 813, 823 -824
(7th Cir. 1999) ("[Plaintiff's] sparse letter writing campaign can hardly be characterized as a
serious attempt to resolve its concerns regarding [defendant's] products and advertising. There is
no evidence in the record that [plaintiff] suggested or pursued any type of bilateral solutions or
provided an explanation regarding [plaintiff's] inactivity regarding its efforts to resolve its
claims . . . .").

### 2.  Delay was not excusable

Having found that delay in asserting the claim occurred, the next question is whether that
delay was excusable.  SGM relies on a number of non-binding, patent cases to support the
proposition that its involvement in other litigation, and 3M's alleged notice of SGM's claims,
excuse the delay.  SGM reliance is misplaced, and in at least one respect, disingenuous.

Quoting *Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA,* 944 F.2d 870, 877
(Fed. Cir.1991), SGM argues that "[a] patent owner may avoid the consequences of what would
otherwise be an unreasonable delay in filing suit by establishing that he or she was engaged in
'other litigation.'"  What SGM glosses over is the requirement that a patentee, or plaintiff,
*"notify the other alleged infringers of his pending lawsuit and his intent to enforce the patent*

7

*against other infringers upon its completion."* Watkins v. Northwestern Ohio Tractor Pullers *Ass'n, Inc.,* 630 F.2d 1155, 1162 (6th Cir. 1980) (emphasis added). *See also* 6 McCarthy on Trademarks §31:16 ("[N]otice to the alleged infringer that the patentee was delaying enforcement until conclusion of the other litigation . . . prevents a defendant from being lulled into a false sense of security and permits defendant to file suit itself for a declaratory judgment. Such a sensible limitation on the 'other litigation' defense could be applied to trademark infringement suits as well.") (footnotes omitted).  Moreover, at least one court has found that in the trademark context, "other litigation . . . does not excuse a failure to give prompt warning." *Tandy Corp. v. Malone & Hyde, Inc.*, 581 F. Supp. 1124, 1128 (M.D. Tenn. 1984) *rev'd on other grounds*, 769 F.2d 362 (6th Cir. 1985), *cert. denied,* 476 U.S. 1158 (1986).

I address first SGM's claims that it was involved in other litigation.  SGM prosecuted two separate actions between July, 2002 and September, 2007.  First, in case number 02-61625-CIV-JAL, SGM brought a trademark infringement action against Blue Water Pools, Inc.  That case commenced in November, 2002, and was dismissed with prejudice (pursuant to settlement) in February, 2004.  Although a motion to reopen was filed over two years later, that motion was denied.  Second, SGM sued Laticrete Int'l, Inc. for patent infringement and unfair competition, in case number 06-60119-CIV-JIC.  The complaint there was filed in January, 2006, and the case was terminated on summary judgment in favor of the defendant in October, 2006.  An appeal was taken to the Federal Circuit in November, 2006, and the decision of the district court was affirmed in October, 2007.  Although there were some post-trial motions, it appears from the docket that no action was taken from March through September, 2007.[5]  These two suits do not

---

[5]The Court is aware that during that interval SGM may have been preparing briefs for its appeal, but there is no evidence of that in the record.  Even taking judicial notice of the Federal Circuit's docket in that case, SGM's initial brief, was due March 25, 2007, with a response due

account for the four months that elapsed between SGM's July, 2002 email to 3M and the November, 2002 initiation of the suit against Blue Water Pools, Inc.  Nor does SGM offer any information or documentation showing that it was consumed with litigation during its appeal of the *Laticrete* decision.  More importantly, and more obviously, SGM has presented no evidence that it was involved in any litigation between dismissal of the case against Blue Water Pools, Inc. and the initiation of the case against Laticrete Int'l, Inc. -- a span of nearly two years.[6]

Additionally, SGM failed to provide 3M with the requisite notice.  Plaintiff's flipping from a request for the domain name (email), to allegations of wrongdoing and a demand for the domain name (first letter), and then again back to alleging no wrongdoing and seeking an amicable solution (second letter), is far from prompt notice that SGM intended to file suit.  Nothing in the record, or even SGM's briefs, reflects that SGM notified 3M of its involvement in other litigation and intent to sue upon completion of that litigation.  If anything, the silence between contacts, and the content of last letter could have lulled 3M into a false sense of security.  In response to SGM's February, 2005 letter, 3M refused to comply with SGM's demands, set forth its basis for not complying, and stated "that to the extent [SGM] continues to assert these baseless allegations . . . 3M will defend itself vigorously and will not hesitate to pursue immediate declaratory relief."  SGM's reply to this was silence for over two years, obviating any action by 3M.  The first break in the silence, the June, 2007 letter stating "we seek to find an amicable and cost-effective resolution" and "please contact me to discuss possible

---

May 29, 2007, and reply due June 20, 2007.  Argument was set for October 3, 2007.

[6]Although it does not affect my analysis, it is curious to note that SGM is arguing that its involvement in other litigation prevented it from filing against 3M, when its motion to reopen the Blue Water Pools, Inc. case came *after* it had filed the complaint against Laticrete Int'l, Inc.

avenues of resolution," provided no explanation for the delays, and at best only implied SGM's intent to sue.

### 3. Undue prejudice to defendant

SGM's delay in asserting its claim was inexcusable. To successfully assert a laches defense, however, 3M must also show that it was prejudiced by this delay. While 3M has not argued that it has suffered direct economic prejudice, it has persuasively argued that it has suffered evidentiary prejudice.

This is not the "classic" trademark laches case. There, defendant uses a mark, is notified by plaintiff that its use is infringing, and defendant responds by arguing that the use is not infringing and therefore it will continue to use the mark. *See* 6 McCarthy on Trademarks §31:13. Plaintiff then responds with silence, whereby defendant, in reliance on plaintiff's silence, "expands sales under the mark either in volume, territory or product line or all three." *Id.* Of course, time marches on, and years later, plaintiff sues for trademark infringement. *Id.* The prejudice there is referred to as expectation or economic prejudice. "Economic prejudice arises from investment in and development of the trademark, and the continued commercial use and economic promotion of a mark over a prolonged period adds weight to the evidence of prejudice." *Bridgestone/Firestone Research, Inc. v. Automobile Club De L'Quest De La France*, 245 F.3d 1359, 1363 (Fed. Cir. 2001); 6 McCarthy on Trademarks §31:12 ("Expectation prejudice encompasses actions by the defendant or actions that it would not have taken or consequences it would not have suffered had the plaintiff brought suit promptly."). Here, 3M did not expand its use of the mark, but actually reduced, and for all practical purposes,

eliminated use of it after AESC's business was fully subsumed by 3M's TSSD.  Additionally,

3M has not invested in sales or marketing of the diamondbrite.com domain name.  That lack of

expansion or expenditure, however, does not foreclose a finding of prejudice.

Separate from expectation prejudice is evidentiary prejudice.  *Bridgestone/Firestone*

*Research, Inc.,* 245 F.3d at 1362 ("Two general categories of prejudice may flow from an

unreasonable delay: prejudice at trial due to loss of evidence or memory of witnesses, and

economic prejudice based on loss of time or money or foregone opportunity.").  "Evidentiary, or

'defense' prejudice, may arise by reason of a defendant's inability to present a full and fair

defense on the merits due to the loss of records, the death of a witness, or the unreliability of

memories of long past events, thereby undermining the court's ability to judge the facts."  *A.C.*

*Aukerman Co.* 960 F.2d at 1033 (*citing  Barrois v. Nelda Faye, Inc.*, 597 F.2d 881, 885 (5th

Cir.1979)).  *See also  Nartron Corp. v. STMicroelectronics, Inc*.,  305 F.3d 397, 412 (6th Cir.

2002), *cert. denied*, 538 U.S. 907 (2003) ("Unavailability of important witnesses, dulling of

memories of witnesses, and loss or destruction of relevant evidence all constitute prejudice.").[7]

Essentially, if there is a delay which "precludes any reasonable possibility of defendant's

gathering evidence . . . or conducting an effective investigation of the circumstances surrounding

the alleged incident" laches may be applied.  *Barrois v. Nelda Faye, Inc.,* 597 F.2d 881, 885 (5th

Cir. 1978).[8]

---

[7]Although I also agree with the logic of *Nartron*, that cost of defending a claim increases significantly due to the increased amount of material that must be searched through and produced, 305 F.3d at 412, 3M has not actually shown that it costs have significantly increased, and so I will not address that potential prejudice.

[8]The Eleventh Cirtcuit, in *Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981) adopted as binding precedent decisions of the Fifth Circuit handed down prior to the close of business on September 30, 1981.

3M argues, correctly, that it has suffered prejudice because of SGM's delay.  First, 3M notes that defending this case, even if there were no delay, would be unusually difficult, as it requires Defendant to prove a negative; that is, that it did not unlawfully acquire diamondbrite.com or use it in commerce in a way likely to cause confusion, in violation of the Lanham Act, and that it did not register, use, or traffic in the domain name with a bad faith intent to profit, in violation of the ACPA.  Compounding this difficulty is the delay which causes 3M to investigate events spanning approximately eight years.  In that time, employees involved with the acquisition of AESC and other relevant employees and would-be witnesses have left 3M; others have changed positions one or more times.  Still others have faded or incomplete memories of the relevant events.  And, documents have been destroyed, lost, or otherwise rendered incomplete in the ordinary course of business.  Moreover, the web platform that hosts both the TSSD and COLORQUARTZ businesses changed during 2004-2006, and significant data regarding web traffic on the old platform was not retained after March 1, 2007.  SGM's only rebuttal is that 3M's production of nearly 15,000 documents belies 3M's claim that it is unable adequately investigate and defend.  In this Court's experience, production of 15,000 documents, especially for a corporation the size of 3M, is relatively small discovery.  *See, e.g.*, *U.S. v. Menkes,* 2007 WL 2892393, at *3 (S.D.Fla.,2007) ("'[O]ver the course of his representation, the government produced . . . a total of two hundred thousand documents."); *United Technologies Corp. v. Heico,* 60 F.Supp.2d 1306, 1308 (S.D.Fla. 1999) (two and a half million pages of discovery).  Even if this were not the case, the quantity of the documents actually produced is not necessarily indicative of the burden to discover and produce those documents.  Nor is it any indication of the documents or witnesses that *could not* be located, or the memories that could not be refreshed.

12

**B.** **SGM's allegations of "unclean hands"**

In an attempt to rebut 3M's affirmative defense, SGM argues that because laches is an equitable defense, 3M's unclean hands prevent its application.

> "This maxim ['he who comes into equity must come with clean hands'] is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant."

*Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 814 (1945). It is an odd situation that causes SGM to use what is traditionally a shield, as a sword against another traditional affirmative defense. Essentially, SGM contends that even if all the requirements for laches are met, the doctrine should not be applied here because 3M's actions in re-registering diamondbrite.com were in bad faith. More specifically, SGM argues that 3M's actions were intentionally calculated to trade upon SGM's reputation. This argument is unavailing.

As unclean hands is an affirmative defense, even when used as a defense to a defense, SGM has the burden proof. Fed. R. Civ. P. 8(c). "To succeed in an unclean hands claim, a plaintiff is required to show that the defendant has 'engaged in particularly egregious conduct which would change the equities significantly in plaintiff's favor.'" *Serdarevic v. Advanced Medical Optics, Inc.,* 532 F.3d 1352, 1361 (Fed. Cir. 2008) (quoting *A.C. Aukerman Co.*, 960 F.2d at 1033). As made clear by the Federal Circuit, the actions (or inactions) of the party alleged to have unclean hands must exceed mere misconduct or neglect. Instead, the conduct must be *egregious* and *significantly* change the equities, such as when a party asserting laches is actually responsible for the delay in bringing suit, or where that same party engendered reliance

13

by the opposing party through concealment or misrepresentation.  *See Potash Co. of America v. Int'l Minerals & Chem. Corp.*, 213 F.2d 153, 155 (10th Cir. 1954); *E.T. Manuf. Co. v. XOMED, Inc.*, 679 F.Supp. 1082, 1085-86 (M.D.Fla. 1987) (quoting *Potash*, 213 F.2d at 155).

SGM has not met its burden.  SGM has provided absolutely no support for the conclusion that 3M has attempted to trade on SGM's reputation.  If anything, the rest of SGM's argument, that 3M's *non-use* of the domain name is evidence of bad faith, directly contradicts the argument that 3M has traded off of SGM's reputation.  If the domain name is the mechanism by which SGM claims 3M is trading off SGM's reputation, than an inactive domain name and non-existent website cause that claim to fail.

Additionally, the claim that "[t]he only purpose for acquiring the diamondbrite.com domain name was to divert customers from SGM's products" is also entirely unsupported by SGM[9], and controverted by the record evidence.  In multiple documents, including a sworn declaration and its Statement of Material Facts, 3M has made clear that the purchase of diamondbrite.com was part of a substantially larger purchase of the assets of AESC, including multiple patents, trademarks, copyrights, and domain names.  SGM did not controvert 3M's facts regarding the purchase of AESC's assets, and has levied no more than conclusory allegations that 3M intended to divert SGM's customers.

Even if SGM had submitted some support for these allegations, is presents no argument as to why such actions by 3M would rise to the level of egregious conduct, or why they would have delayed SGM from bringing action.

---

[9]Not only does the record not support this allegation, but SGM does not even provide a citation to point the Court to any evidence it believes provides support.

**C.      Re-registration and the purchase of Google AdWords do not restart the clock**

SGM also claims that 3M's multiple re-registrations of diamondbrite.com, and the

purchase in 2005 of "Diamond Brite" as a Google AdWord, should either bar application of

laches, or at least restart the clock making the present suit timely.  I reject both of these

arguments as baseless.

First, the purchase of Google AdWords has nothing to do with the timing of SGM's

claims regarding 3M's use of diamondbrite.com.  The purchase of the AdWords could not

possibly have caused SGM to delay filing its lawsuit.  Further, here 3M only maintained the

"Diamond Brite" AdWords program for three weeks.  SGM has not even attempted to argue that

this amounts to particularly egregious conduct.

As to the re-registrations, SGM's arguments fail for two reasons.  First, the re-

registrations, like the purchase of AdWords, could not possibly have delayed SGM in filing suit,

nor do they rise to the level of conduct necessary to change the equities significantly.  Second,

and in some ways more importantly, failure to re-register diamondbrite.com would likely have

mooted any claim for prospective relief.  If 3M did not re-register the domain name, the name

would have lapsed, and SGM, if acting diligently, may have been able to obtain it with minimal

effort.

**D.      Laches bars the ACPA claim**

The Eleventh Circuit has not considered whether laches can be applied to

anticybersquatting claims.  At least four courts have, however, and all four have found that the

doctrine is applicable to the ACPA.  *See Flentye v. Kathrein,*  485 F.Supp.2d 903, 916 (N.D.Ill.

2007) ("Since the ACPA is an amendment to the Lanham Act, the Court will analyze these

arguments [that the ACPA claim is barred by laches] under Lanham Act case law generally.");

*Ford Motor Co. v. Catalanotte*, 342 F.3d 543, 550 (6th Cir. 2003) (applying the laches analysis to an ACPA claim); *Omega S.A. v. Omega Eng'g, Inc.*, 228 F.Supp.2d 112, 140-41 (D.Conn. 2002) (same); *Mashantucket Pequot Tribe v. Redican,* 403 F.Supp.2d 184, 198 (D.Conn. 2005) ("[i]t is well established that the equitable defense of laches may be applied to cases brought under the Lanham Act and the ACPA is an amendment to the Lanham Act.") (internal quotation marks and citation omitted). I agree with these courts that, as the ACPA is an amendment to the Lanham Act, the doctrine of laches may be applied to bar ACPA claims.

One of the problems with applying laches to bar an ACPA claim, however, is that many ACPA claims are "continuing-harm" claims. That is, the alleged infringer or cybersquatter continues to possess and use the domain name in violation of the ACPA[10]. *See Mashantucket Pequot Tribe ,* 403 F.Supp.2d at 198 ("The harm of which [plaintiff] complains in its ACPA claim is ongoing, insofar as [defendant] maintains possession and use of the foxwood.com domain name, and the plaintiff seeks only prospective relief. Therefore, the violation of the ACPA continues to accrue (or at least did continue to accrue past the date on which the

---

[10]Although addressed in more detail *infra*, the ACPA states:

> A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person
> (i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and
> (ii) registers, traffics in, or uses a domain name that--
> > (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;
> > (II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; . . . .

15 U.S.C. §1125(d)(1)(A).

Mashantucket brought this action).").  While this continuing-harm argument may prevent application of a statute of limitations defense, laches is an equitable defense that can bar a claim even if the statute of limitations has not run.  *See id.* at 198-99.  "A federal court may not be bound by a State statute of limitation and yet that court may dismiss a suit where the plaintiffs' lack of diligence is wholly unexcused; and both the nature of the claim and the situation of the parties was such as to call for diligence." *Holmberg v. Armbrecht,* 327 U.S. 392, 396 (1946) (quoting *Benedict v. City of New York*, 250 U.S. 321, 328 (1919) (internal quotation marks omitted).  As the Supreme Court further noted in *Holmberg*:

> Equity eschews mechanical rules; it depends on flexibility. Equity has acted on the principle that 'laches is not, like limitation, a mere matter of time; but principally a question of the inequity of permitting the claim to be enforced,-an inequity founded upon some change in the condition or relations of the property or the parties.'

327 U.S. at 396 (citation omitted).

Here, for the same basic reasons discussed in Section III.A. *supra*, SGM's ACPA claim is barred by laches.  The ACPA, 15 U.S.C. §1125(d), became effective November 29, 1999.  Plaintiff knew about 3M's ownership and non-use of diamondbrite.com as early as July 16, 2002.  SGM did not file suit until September 27, 2007, and as discussed above, nothing occurred in the interim to excuse or toll any of the more than five years that lapsed.  And, the same evidentiary prejudice that plagues 3M in the unfair competition claim is equally present under the ACPA claim.  While memories and evidence regarding the more recent re-registrations are not likely to be significantly effected, SGM failed to controvert 3M's contentions in its Statement of Material Facts that the re-registrations were simply done as both routine company policy, and to protect one of 3M's trademarks, DIAMOND GRADE.

* * * *

SGM's claims for unfair competition (Count I) and for violation of the ACPA (Count II) are barred by the doctrine of laches.  Even if this were not the case, both claims fail on the merits.

## IV.   Unfair Competition

"Section 43(a) of the Lanham Act creates a federal cause of action for unfair competition[.]" *University of Florida v. KPB, Inc.*,  89 F.3d 773, 775 (11th Cir. 1996).  The Act provides, in part:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, . . .
>
> * * *
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. §1125.  It is the burden of the Plaintiff to prove that "(1) its mark was used in commerce by the defendant without the registrant's consent and (2) the unauthorized use was likely to cause confusion, to cause mistake, or to deceive." *Optimum Technologies, Inc. v. Henkel Consumer Adhesives, Inc.,* 496 F.3d 1231, 1241 (11th Cir. 2007) *(*quoting *Burger King Corp. v. Mason,* 710 F.2d 1480, 1491 (11th Cir. 1983)).  "Use in commerce" refers to use in connection with the sale or advertisement of goods.  *See* 15 U.S.C. §1114(1)(a); *North American*

18

*Medical Corp. v. Axiom Worldwide, Inc.,* 522 F.3d 1211, 1218-19 (11th Cir. 2008 ) ("infringing

use,. . . requires a use in commerce . . . of a registered mark in connection with the sale . . . or

advertising of any goods.") (internal quotation marks omitted).  The Eleventh Circuit applies

seven factors to determine whether a likelihood of confusion exists: "(1) the strength of the

plaintiff's mark; (2) the similarity of the marks; (3) the similarity of the parties' products or

services; (4) the similarity of the parties' retail outlets and customers; (5) the similarity of

advertising media used; (6) the existence of actual confusion; and (7) the defendant's intent."

*HBP, Inc. v. American Marine Holdings, Inc*.,  290 F.Supp.2d 1320, 1327 (M.D.Fla. 2003)

(citing *Dieter v. B & H Ind. of Southwest Florida, Inc.*, 880 F.2d 322 (11th Cir.1989) and

*Frehling Enters., Inc. v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1335 (11th Cir.1999)).

 SGM puts forth two entirely separate arguments for how 3M has used the DIAMOND

BRITE mark.  First, SGM argues that 3M's purchase of "diamond brite" or related words as

Google AdWords is clear use in commerce.  Second, SGM contends that the mere use of

"diamond brite" in the 3M owned domain name diamondbrite.com constitutes use in commerce.

Both of these arguments are unavailing.  Moreover, SGM has failed to show any likelihood of

confusion.

 SGM's operative Complaint does not raise any allegation or claim that 3M's use of

Google AdWords is a Lanham Act violation.  Although SGM attempted to amend its Complaint

to add such a claim, the Court denied SGM's motion to amend for lack of diligence, lack of good

cause, and as an attempt to avoid adverse summary judgment.  Moreover, an obvious problem

with SGM's argument with regard to the AdWords is the lack of a link between use and

likelihood of confusion.  Even assuming *arguendo*, that purchase of the Google AdWords

19

constitutes "use" for infringement purposes[11], SGM has not argued that this use has created a

likelihood of confusion.  In fact, SGM specifically argues only that "3M's unauthorized use of

SGM's DIAMOND BRITE mark *in its domain name* is likely to cause confusion . . . ."

Therefore, because the Google AdWords claim was not properly plead, and SGM has not argued

that the use of the AdWords creates (or created) a likelihood of confusion, nothing further need

be written on this issue.

SGM's argument that mere use of the mark DIAMOND BRITE in the domain name

diamondbrite.com constitutes unfair competition is without support.  The cases relied upon by

SGM are non-binding, unpersuasive, and not factually analogous.  And, at least as regards

*PACAAR, Inc. v. Telescan Techs., LLC*, 319 F.3d 243 (6th Cir. 2003) *overruled in part***,** *KP*

*Permanent Make-Up, Inc. v. Lasting Impression I, Inc.,* 543 U.S. 111 (2004) , SGM has

misunderstood the decision.

SGM, in its Motion for Summary Judgment, stated: "Use of a trademark in a domain

name constitutes "'use in commerce.'" To support this proposition, that mere use of a mark in a

domain name creates the requisite use in commerce, SGM first cites *PACAAR*.  However, the

court in *PACAAR* went no further than to find that "words in many domain names can and do

communicate information as to the source or sponsor of the web site."  *PACAAR,* 319 F.3d at

250.  In fact, the court there specifically noted that

> "[defendant's] argument [that the district court impermissibly
> adopted a *per se* rule that every domain name identifies the owner
> or affiliation of the site] distracts from the key issue here: whether

---

[11]It does appear that the Eleventh Circuit has now concluded that at least the use of
trademarks in meta tags, where the search result displays the trademark in a way which may
cause confusion, is "use in commerce."  *North American Medical Corp.,* 522 F.3d at 1218-20.
However, that is not the same as saying that the purchase of ad words which result in sponsored
links will necessarily constitute "use in commerce."

> [defendant's] use of the "Peterbilt" and "Kenworth" trademarks in
> its domain names is likely to cause confusion among consumers
> regarding the source or sponsorship of the web sites. In making
> that determination, the district court properly considered each of
> the eight Frisch's Restaurants factors.

*Id.* at 250-51.

Furthermore, the sites involved in *PAACAR* were all active, allowing consumers to search for new or used trucks for sale.  This was undoubtedly "use in commerce" in connection with the sale or advertisement of goods.  Unlike *PAACAR*, diamondbrite.com is inactive, and has been so since the completion of the transfer of AESC's business to 3M's, approximately six-years ago.  The only time 3M used the domain name in connection with the sale or advertising of goods was during that transition period, and then, it was in connection with AESC's products.

The other cases relied upon by Plaintiff are similarly inapplicable.  In *Brookfield Communications, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036 (9th Cir. 1999), the court did find that the defendant's domain name, moviebuff.com, violated the plaintiff's trademark rights, but it did not, as SGM suggests, merely conclude that the use of another's trademark in a domain name was use in commerce.  In *Brookfield*, one of issues was priority, with both parties actually arguing that their respective uses in commerce pre-dated the other's.  *Id.*  at 1049-53.  The court did not directly address whether use of a trademark in a domain name constituted use in commerce.  Even had the court done so, the analysis could not have been the same because moviebuff.com was an active site, containing a searchable database intended to aid consumers in the rental and purchase of movies. Moreover, the Ninth Circuit  at least implied that the district

court was correct in "recognizing that mere registration of a domain name was not sufficient to constitute commercial use for purposes of the Lanham Act . . . ." *Id*. at 1052.[12]

*PETA v. Doughney*, 263 F.3d 359 (4th Cir. 2001) is also easily distinguished. There, the defendant created the website, peta.org, but not for the plaintiff, People for the Ethical Treatment of Animals. Instead, defendant's website was dedicated to "People Eating Tasty Animals," a view clearly antithetical to PETA's. In affirming the district court's entry of summary judgment in favor of plaintiff PETA, the Fourth Circuit discussed how Doughney's site was used in connection with the sale or advertisement of goods or services. First, because an actual site existed at peta.org, with information accessible to an internet user, the court found that it "[was] likely to prevent Internet users from reaching [PETA's] own Internet web site. The prospective users of [PETA's] services who mistakenly access Defendant's web site may fail to continue to search for [PETA's] own home page, due to anger, frustration, or the belief that [PETA's] home page does not exist." *Id.* at 366. Second, the court found that defendant had links on his site to over thirty other websites which offered goods and services. *Id.* Neither of these factors are at play here. Without an active website during the period after AESC's business had been subsumed, neither of the above bases for finding use in connection with the sale or advertisement of goods or services can be applied.

*OBH, Inc. v. Spotlight Magazine, Inc.*, 86 F.Supp.2d 176 (W.D.N.Y. 2000) and *Planned Parenthood Fed'n of America v. Bucci*, No. 97 Civ. 0629, 1997 WL 133313, (March 24, 1997)

---

[12]Although not exactly the same situation, it would seem that mere registration of a domain name, or use of a domain name only to indicate an address on the internet, not to identify the source of goods, would be equivalent to an inactive domain name or website, as no content would be available to internet users. *See* 6 McCarthy on Trademarks §25:76 ("[N]either merely reserving a domain name nor use of a domain name solely to indicate a site on the Internet, in and of itself, constitutes "goods or services" in the Lanham Act sense. Rather, one must consider the content of the site identified by the domain name.").

*aff'd* 152 F.3d 920 (2nd Cir. 1998), fair no better.  *PETA* relied on both of those cases, and both

of those cases again involved active sites that had links to commercial websites.  In any event,

*OBH* and *Planned Parenthood*, are both nearly a decade old.  As with any widespread change in

technology, there is a learning curve.  Even if those cases were correct when decided, I decline to

adopt the position today that internet users of any significant number would be frustrated or

hindered by merely not arriving at the expected site the first time a web address (domain name)

was typed in.  *See Bosley Medical Institute, Inc. v. Kremer,*  403 F.3d 672, 679 (9th Cir. 2005)

("To the extent that the PETA court held that the Lanham Act's commercial use requirement is

satisfied because the defendant's use of the plaintiff's mark as the domain name may deter

customers from reaching the plaintiff's site itself, we respectfully disagree with that rationale.")

With the advent of multiple, and increasingly powerful search engines, it is unlikely that a

potential consumer of SGM's products would be turned away by not finding a website at

diamondbrite.com.  In any event, SGM has presented not a scintilla of evidence to show that

consumers have been prevented from accessing SGM's own website, or prevented from

obtaining any of SGM's goods or services.  *Cf. Wells Fargo & Co. v. WhenU.com, Inc.*, 293

F.Supp.2d 734, 758-59 (E.D.Mich. 2003) (distinguishing *PETA* and *Planned Parenthood* and

finding no evidence "to suggest that consumers are unable to reach their sites as a result of the

simultaneous appearance of [defendant's] advertisements on their computer screens. To view

plaintiffs' websites in full, consumers only need to move, minimize, or close the advertisement

windows.").

Even if SGM had shown that 3M used diamondbrite.com "in commerce" in connection

with goods or services, or the sale or advertisement thereof, SGM has not presented evidence to

support a finding of likelihood of confusion.  All of the argument put forth by SGM is written as

if the domain name were an active website at or through which consumers could view 3M

products or would be redirected to other 3M websites.  That is simply not the case.  The seven

factors use to determine whether a likelihood of confusion exists become irrelevant if there is no

"use" to compare the mark to.  That is, a likelihood of confusion cannot exist when nothing

exists to be confused with the mark in question.  Here, for the last six-years, no domain name or

website with any content has existed that is accessible by the consuming public.

Diamondbrite.com exists only as a domain name registration.

SGM, without any factual support, and without any factually on-point case law, also

argues that 3M has created initial interest confusion[13].  The Eleventh Circuit has only addressed

this type of confusion in one case, and there, because it found actual source confusion, the court

found it unnecessary to determine whether initial interest confusion could be used to establish a

likelihood of confusion. *North American Medical Corp.,* 522 F.3d at 1222 ("[W]e need not

decide, as [the Seventh and Ninth Circuits] did, whether initial interest confusion alone may

provide a viable method of establishing a likelihood of confusion. Unlike those courts, we are

not faced with a situation where the trademarks are used without being displayed to

consumers.").

Even if this action was not barred by laches, because SGM cannot show the requisite use

in commerce or likelihood of confusion, and has presented no viable support for its argument

---

[13]Initial interest confusion occurs where, "[a]lthough there is no source confusion in the
sense that consumers know they are patronizing [the competitor] rather than [the plaintiff], there
is nevertheless initial interest confusion in the sense that, by using [the trademark] to divert
people looking for [the plaintiff's] web site, [the competitor] improperly benefits from the good
will that [the plaintiff] has developed in its mark."  *North American Medical Corp.,* 522 F.3d at
1221 (quoting *Brookfield*, 174 F.3d at 1065).

that initial interest confusion occurred or is occurring, 3M's Motion for Summary Judgment would also prevail on the merits.

## V.     ACPA

The ACPA, 15 U.S.C. §1125(d)(1)(A)  "was directed at preventing the cybersquatting on the Internet by the use of domain names that are confusingly similar to trademarks and person's names."  6 McCarthy on Trademarks §25:78.  The law was meant

> "to protect consumers and American businesses, to promote the growth of online commerce, and to provide clarity in the law for trademark owners by prohibiting the bad-faith and abusive registration of distinctive marks as Internet domain names with the intent to profit from the goodwill associated with such marks-a practice commonly referred to as 'cybersquatting'."

*Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*,  202 F.3d 489, 495 (2nd Cir. 2000) (quoting S.Rep. No. 106-140, at 4 (1999)).  Cybersquatters are generally defined as individuals or entities that register famous or well-known trademarks, brand names, or even corporate names,  with the intent of forcing the owners of those marks or names to buy the domain names.  *See Interstellar Starship Services, Ltd. v. Epix, Inc.*, 304 F.3d 936, 946 (9th Cir. 2002) ("Cybersquatters register well-known brand names as Internet domain names in order to force the rightful owners of the marks to pay for the right to engage in electronic commerce under their own name."); *see also Ford Motor Co. v. Catalanotte*  342 F.3d 543, 549 (6th Cir. 2003) ("Registering a famous trademark as a domain name and then offering it for sale to the trademark owner is exactly the wrong Congress intended to remedy when it passed the ACPA").

To successfully prosecute an ACPA claim, a plaintiff must prove four elements:

(1) Defendant has registered, trafficked in[14], or used the domain name;

(2) Said domain name is identical or confusingly similar to plaintiff's mark;

(3) The mark was distinctive (or famous) at the domain name was registered;

(4) The defendants actions were done with the bad faith intent to profit from plaintiff's mark.

*See* 15U.S.C. §1125(d)(1)(A).   The analysis of bad faith intent involves a further nine factors, discussed below.  First, however, I note that there is no need to evaluate the first three elements, because 3M has shown that no genuine issues of material fact exist to support SGM's claim of bad faith intent, and SGM has wholly failed to adduce evidentiary support for that claim.

The ACPA specifically sets out nine nonexhaustive factors to aid in determining whether a defendant acted with bad faith intent. *See* 15 U.S.C. 1125(d)(1)(B)(i).  I weigh each factor in turn.

*(I) the trademark or other intellectual property rights of the person, if any, in the domain name;*

At one time, 3M did have trademark rights in DIAMOND BRITE, as it was purchased from AESC.  However, 3M has since let those rights lapse.  This factor favors SGM.

*(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;*

---

[14]SGM appears to use "register" and "traffic" synonymously. The two are clearly different, however.  "In the cybersquatting context, the term 'traffics in' denotes the buying, selling or otherwise trading or dealing in an offending domain name."  6 McCarthy on Trademarks §25:78 (citation omitted).  As SGM has not actually argued that 3M impermissibly bought, sold, or otherwise traded in diamondbrite.com, I only consider the ACPA claim under the act of registration.

This factor is not applicable here as it is intended to apply to persons and situations involving personal websites (using a person's name or nickname).

*(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;*

Prior to inactivating diamondbrite.com, 3M used the domain name in connection with the bona fide offering of goods produced by 3M's then new acquisition, AESC.  SGM's argument that this should not qualify as a bona fide offering because it was made for only a brief period of time and no use has been made since, does not comport with the factor itself.  The statute refers to *any* prior use.  Moreover, the argument that 3M has not offered any goods or services through the site since re-registering it further undermines SGM's unfair competition argument.  This factor favors 3M.

*(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;*

As diamondbrite.com has either been used for the bona fide offering of goods, or inactive and inaccessible to consumers since its acquisition by 3M, this factor is irrelevant.  The factor is meant to apply to active websites used for comparative advertising, criticism, comment or parody, etc.  It cannot be applied here, where no active site exists.

*(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;*

The record is devoid of any evidence that 3M intended to divert customers from SGM's website.  SGM presents only two arguments to support this factor.  One, that 3M admitted to, at one time, diverting customers from diamondbrite.com to another 3M website, and two, that a

search by a sophisticated internet user to determine who owns the domain name registration would reveal that 3M is the owner, and would therefore cause confusion.  Both of these arguments are entirely without merit.  In fact, the Court can only conclude that the first is a blatant misrepresentation of the facts.

3M admitted only that "[s]ince its acquisition by 3M, the domain name diamondbrite.com has never referred, redirected or transferred Internet traffic to any website other than the TCM website at www.3m.com/tcm, and 3M has no evidence that it referred, redirected or transferred Internet traffic even to that website after April 2002."  SGM could not possibly have confused this with an admission of diverting traffic to 3M websites containing COLORQUARTZ products.

SGM's claim that Michael Torrisi and Elizabeth McKee, the head of information technology and the executive vice-president of SGM, respectively, both testified to having been redirected from diamondbrite.com to a 3M website featuring COLORQUARTZ products is extraordinarily late in coming, and unsupported.[15]  There is no need to address at this juncture whether the depositions are shams, meant only to avoid summary judgment. *See Van T. Junkins and Associates, Inc. v. U.S. Industries, Inc.*, 736 F.2d 656, 657 (11th Cir. 1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.").  The only deposition to even be filed, McKee's, contains only one paragraph about being redirected or diverted, and even that is a question posed by 3M's counsel, quoting from the second amended

_____

[15]Moreover, beyond these two allegations, SGM has never claimed that 3M used diamondbrite.com in conjunction with the sale or advertising of any competing product, namely COLORQUARTZ.

complaint.  Instead, the discussion mainly deals with ad words.  It in no way supports the

contention that McKee was redirected to a competing 3M site, or that she even visited

diamondbrite.com.  The Court cannot fathom why SGM even submitted the deposition.[16]

SGM's second argument is equally untenable.  In essence, SGM has argued that by

simply owning diamondbrite.com, 3M creates confusion and that this is evidence of 3M's intent

to divert customers.  SGM fails to explain this curious argument.  However, it is exceedingly

unlikely that a consumer looking for SGM's products, and not finding a website at

diamondbrite.com, would then endeavor to determine who owns the domain name, instead of

simply going to SGM's website or using any of the many search engines to search for the

products.  Moreover, even if this were a likely occurrence, there is no evidence that this would

divert consumers for commercial gain or to tarnish the mark, or that this was 3M's intent in

acquiring or maintaining the domain name.  This factor also favors 3M.

*(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;*

This factor clearly favors 3M, despite SGM's argument that the factor is neutral.  3M

never offered to transfer, sell or assign the domain name to any party.  In fact, 3M has

consistently refused to turn over the mark and has made clear its opinion that it is entitled to

maintain diamondbrite.com.  Moreover, as discussed above, 3M did for a time use the domain

name in the bona fide offering of goods.  SGM argues that "one who 'registers a domain name

identical to a distinctive or famous mark is a cybersquatter even if the defendant did not contact

---

[16]Calling it a deposition is being kind.  SGM submitted only three pages of the deposition, the cover page and pages 46 and 47.  There is not even evidence that McKee was properly sworn before testifying.

the mark owner and did not try to sell the domain name to the mark owner.'" SGM quotes

Professor McCarthy for this proposition, but conveniently leaves out the subsequent sentence:

"Rather, the inevitable inference was that defendant knew it owned a domain name consisting of

a famous mark and it hoped to profit by waiting for the mark owner to contact defendant to make

a deal." 6 McCarthy on Trademarks §25:78.  This sentence vitiates SGM's argument on this

factor.  And, SGM, wisely, has not even attempted to argue that 3M hoped to sell the domain

name.

     *(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;*

     SGM, in its response to 3M's motion for Summary Judgment, misstated this factor.  The

issue to be examined is "material and misleading false *contact* information," not simply "false

information" as SGM claims.  In that respect, SGM has produced nothing to indicate that 3M

provided any type of false contact information, let alone material and misleading false contact

information.  This factor favors 3M.

     *(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties;*

     "This factor recognizes as a marker of one type of cybersquatting the warehousing of

many domain names (sometimes hundreds or thousands) consisting of various identical or

similar combinations of the marks of others." 6 McCarthy on Trademarks §25:78.  3M currently

owns over 13,000 domains names.  After review of these names, SGM has presented the Court

with 18, which it claims 3M has no right to own, and which are evidence of bad faith.  Most

strikingly, SGM has provided no basis for the claim that 3M has no legitimate rights in these domain names; instead it presents, on summary judgment, a bald conclusion.

Moreover, SGM's research, was far from thorough.  Using the same services available to SGM, namely a whois.net search of domain name registrations and the Google search engine, the Court will take judicial notice that several of the domain names listed by SGM are either not registered to 3M, or have an obviously legitimate connection to 3M.  *See* Fed. R. Evid. 201.  For example, SGM claims that 3M owns tcm.com and toyotagraphics.com.  However, whois.net lists Turner Broadcasting System, Inc. as the registered owner of tcm.com, and Toyota Motor Sales, USA, as the registrant of toyotagraphics.com.  And, a quick search using Google revealed that ILUMA is a trademark of a company named Imtec, which is a 3M company, making 3M's ownership of 3M-iluma.com appear entirely appropriate.  A similar search reveals that 3M acquired Diamond Productions Inc. in June, 2007, negating SGM's argument that 3M has no right to diamondproductionsinc.biz.  This factor favors 3M.

*(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.*

SGM has not adduced significant evidence of the strength of DIAMOND BRITE. However, the Eleventh Circuit rule is that where a mark has become incontestable it is "presumed to be at least descriptive with secondary meaning, and therefore a relatively strong mark." *Dieter v. B & H Industries of Southwest Florida, Inc.*, 880 F.2d 322, 329 (11th Cir.1989). However, the inquiry cannot end there, as 3M has presented evidence of third-party use of the mark.

Third-party use of a mark can significantly weaken the mark diminish protection accorded to it.  *See John H. Harland Co. v. Clark Checks, Inc.*, 711 F.2d 996, 973-74 (11th Cir.

1983).  3M has presented multiple other uses of DIAMOND BRITE; both marks which are or

were registered and unregistered marks.  None of the uses is in the precise market as SGM's

DIAMOND BRITE, but even uses on unrelated goods may weaken the mark and narrow the

scope of protection.  *See Sun Banks of Florida, Inc. v. Sun Federal Sav. & Loan Ass'n,* 651 F.2d

311, 316, 211 U.S.P.Q. 844, 848 (5th Cir. 1981) ("[W]e find the extensive third-party use of the

word 'Sun' impressive evidence that there would be no likelihood of confusion between Sun

Banks and Sun Federal. * * * *  The evidence abundantly established existing third-party use of

the name 'Sun,' both within and without the financial community.").  That said, I am not

persuaded that the use of DIAMOND BRITE on unrelated products has diminished the marks

strength or renown within the class of consumers who would normally purchase SGM's

DIAMOND BRITE.  *Cf. Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee

En 1772,* 396 F.3d 1369, 1375 (Fed. Cir. 2005) ("[T]his court holds that the proper legal

standard for evaluating the fame of a mark under the fifth *DuPont* factor is the class of customers

and potential customers of a product or service, and not the general public.").  Accordingly, 3M

has not rebutted the presumption that DIAMOND BRITE is relatively strong.[17]  This factor must

then, by default, favor SGM.

Of the nine factors, then, only two favor SGM (factors I and IX), while two are

inapplicable (factors II and IV), and the remaining five favor 3M (factors III,V, VI, VII, and

VIII).  The analysis--including the fifth factor which SGM terms "critical"--strongly favors 3M.

As such, even if SGM's ACPA claim was not barred by laches, it would be defeated on the

---

[17]I recognize the parties' respective arguments as to the admissibility of the "Brand Study."  The study was submitted by SGM to support the argument that DIAMOND BRITE is a strong or famous mark.  Because, however, the presumption of strength remains unrebutted, there is no need to address the Brand Study, as its admission into evidence would merely result in the same conclusion, and its exclusion has not weighed against SGM.

merits because the evidence does not support the finding that 3M had a bad faith intent to profit from SGM's mark.[18]

## VI.    Evidentiary Issues

In the above analysis, I have been careful to recognize 3M's arguments, and SGM's rebuttals, regarding the admissibility of a significant portion of SGM's asserted facts and supporting documents.  Because much of this evidence was submitted to support the likelihood of confusion argument, and a full analysis of the seven likelihood of confusion factors was not necessary, I decline to address these evidentiary issues beyond what has already been discussed.  However, I must address the admissibility of Mr. Robert Moody's report and accompanying documents.  Mr. Moody is SGM's proposed expert witness.  Mr. Moody's Curriculum Vitae was not submitted with his declaration and summary report.  Although 3M pointed out this failure in its response to SGM's motion for summary judgment, 3M apparently did not recognize that SGM did file Mr. Moody's C.V. and full report as an exhibit attached to Plaintiff's Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment [DE 109], filed July 8, 2008.  Skipping the issue of Mr. Moody's qualifications[19], and SGM's burden to show his admissibility, the report summary attached as Exhibit H to Plaintiff's Statement of Material Facts In Opposition to Defendant's Motion for Summary Judgment, DE 109, is so pervaded by conclusory statements as to be almost without value.  The full report, oddly, is shorter than the

---

[18]Having found that the bad faith factors weigh heavily in 3M's favor, I do not address the "safe harbor" provision of the ACPA.

[19]Mr. Moody's C.V. *may* support SGM's contention that he is an expert in the area of forensic information technology and maybe DNS servers, but nothing in his Declaration, Report, or C.V. supports that he is an expert in economics or marketing.  This is troubling since his most important conclusions relate to 3M's to ability to gain a competitive commercial advantage from its ownership of the dormant diamondbrite.com domain.

summary, at twenty-one pages, as opposed to the summary's thirty-nine, is largely redundant of the summary, and equally afflicted with unsupported opinion.

"[A] trial court may exclude expert testimony that is 'imprecise and unspecific,' or whose factual basis is not adequately explained." *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.,* 402 F.3d 1092, 1111 (11th Cir. 2005). "Moreover, 'nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.'" *Id.* (quoting *Michigan Millers Mut. Ins. Corp. v. Benfield,* 140 F.3d 915, 921 (11th Cir.1998)). Mr. Moody's Declaration contains five paragraphs, of which only paragraphs three and four are of any substance. In paragraph three, Mr. Moody states: "my expert opinion is that 3M . . . can, and almost certainly does, enjoy a commercial benefit from its ownership of the diamondbrite.com domain by accessing and collecting information from that source." To support such a contention, Mr. Moody relies on his own research, coupled with the parties' discovery and the record. However, he cites to no specific discovery documents or evidence in the record, and the Court is aware of none, that support his conclusion. His own research appears to consist of an examination of the general abilities of NeuStar Ultra Services (the company 3M outsourced its Domain Name System hosting to) to allow a user of those services, such as 3M, to log and analyze statistics from its DNS servers. His memorandum does not purport to explain 3M's actual abilities or actions with regard to diamondbrite.com, but only expresses his belief that 3M, through NeuStar, should be able to access certain information such as Internet traffic logs. Paragraph four is only a slight expounding on the conclusion in paragraph three and suffers from the same shortfalls.

The complete report does not include Mr. Moody's declaration, or the memorandum previously included in the summary, and does not repair or redress the problems in the summary report.  It does, however, include a new, six-page report and a few additional screen-captures of the NeuStar UltraDNS system.  The report gives a very brief background of the initial purchase and subsequent registrations of the domain name, background on the Internet and DNS, and the general capabilities of the NeuStar software.  Mr. Moody then spends a total of a page-and-a-half discussing the inspection of 3M's UltraDNS account and what benefits he believes 3M derives from owning diamondbrite.com and hosting it through NeuStar's service.

I am compelled to agree with 3M that there "is simply too great an analytical gap between the data and the opinion proffered," *General Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997), to allow admission of Mr. Moody's declaration, summary report, and complete report. The basis for his conclusions are left utterly unexplained and unsupported and cannot be relied upon.

* * * *

For the reasons discussed above, 3M's Motion for Summary Judgment [DE 96] is **GRANTED**.  SGM's Motion for Summary Judgment [DE 99] is **DENIED**.  All remaining, pending motions are **DENIED** *as moot*.  This Case is **DISMISSED**.

**DONE** and **ORDERED** in chambers, Miami, Florida, this day of September, 2008.

_Marcia G. Cooke_
MARCIA G. COOKE
United States District Judge

Copies furnished to:
*The Hon. Ted E. Bandstra*
*Counsel of Record*